**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENNIS VAN VEEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 10-1635** |
| **vs.** | ) | |
| | ) | |
| **AT&T CORP.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT AT&T CORP.'S MOTION FOR SUMMARY JUDGMENT**

---

**FRANCIS & MAILMAN, P.C.**
MARK MAILMAN
JOHN SOUMILAS
GREGORY GORSKI
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA  19110
(215) 735-8600

## <u>TABLE OF CONTENTS</u>

Table of Authorities ...................................................................................iii

**PRELIMINARY STATEMENT** .............................................................1

**PLAINTIFF'S RESPONSE TO AT&T'S STATEMENT OF MATERIAL FACTS**...............2

**PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS** .....................................11

    A.  Plaintiff Never Had Any Contractual Relationship With AT&T. ...............11

    B.  AT&T's Network "Shutdown" Caused A Widespread Problem Resulting In IDT Customers Having Their Long Distance Service Transferred To AT&T Without Their Permission. ....................................................................14

    C.  AT&T's Billing Of Plaintiff Unambiguously Constituted An Illegal Act Of "Slamming." ........................................................................16

    D.  Plaintiff Repeatedly Requested Absolution From The Illegal Charges Levied By AT&T .......................................................................................19

    E.  Plaintiff Filed A Slamming Complaint With The FCC In Order To Obtain Absolution From The Illegal Charges Levied By AT&T.............................20

    F.  AT&T Continued To Report The Derogatory Account To The Credit Reporting Agencies Despite Allegedly Absolving Plaintiff Of Responsibility For The Debt ......24

        1.  AT&T's Failure To Properly Investigate And Delete The Disputed Account Using The "Response Code." ..........................................25

        2.  AT&T's Verification Of The Account As "Charged-Off" Using The "Account Status Code." ..................................................................27

        3.  AT&T's Failure To Report The Account As "Disputed" By The Consumer Using The "Compliance Condition Code." .....................................29

        4.  AT&T's False And Inaccurate Reporting Of $10 Balance In Responding To Plaintiff's Dispute To Equifax.................................................31

    G.  AT&T As A Matter Of Practice Never Conducts A Meaningful Investigation In Connection With A Dispute Received From A Credit Reporting Agency And Never Acknowledges Any Consumer Dispute Before Marking Any Account As "Disputed." ..........................................................................33

i

H.  Plaintiff Claims Actual Damages And Punitive Damages As A Result Of AT&T's Violations Of The FCRA ............................................................................40

**STANDARD OF REVIEW** ............................................................................42

**ARGUMENT** ............................................................................43

**I.  AT&T REPORTED NUMEROUS INACCURACIES IN RESPONDING TO PLAINTIFF'S CREDIT REPORTING DISPUTES** ........................................43

**II.  AT&T IS RESPONSIBLE TO REPORT AN ACCOUNT AS "DISPUTED" BY A CONSUMER IN CONNECTION WITH RESPONDING TO A CREDIT REPORTING DISPUTE AND DID NOT DO SO IN THIS CASE** ..............................45

A.  The Fourth Circuit And Ninth Circuit Have Held That A Furnisher Is Responsible To Report An Account As "Disputed" By A Consumer In Connection With Responding To A Credit Reporting Dispute ............................................45

B.  Plaintiff Waged Meritorious Disputes To The Credit Reporting Agencies ................47

**III.  AT&T'S PURPORTED INVESTIGATIONS OF PLAINTIFF'S CREDIT REPORTING DISPUTES WERE INHERENTLY UNREASONABLE** ......................49

**IV.  PLAINTIFF MAY RECOVER ACTUAL DAMAGES CAUSED BY AT&T'S VIOLATIONS OF THE FCRA** ........................................52

A.  Plaintiff's Right To Recover Actual Damages For Credit Defamation ......................53

B.  Plaintiff's Right To Recover Actual Damages For Emotional Distress ......................55

**V.  THE WILLFUL NATURE OF AT&T'S CONDUCT IS A JURY QUESTION** ..........60

A.  Plaintiff Is Only Required To Establish That AT&T Acted In Reckless Disregard Of Plaintiff's Consumer Rights To Prove Willful Conduct ..........................60

B.  Substantial Evidence Exists For A Reasonable Jury To Conclude That AT&T's Conduct Was In Reckless Disregard Of Plaintiff's Consumer Rights ......................63

C.  The "Reasonable Reading" Standard Set Forth In *Safeco* Is Inapplicable To This Matter ............................................................................65

**VI.  THE COURT POSSESSES JURISDICTION TO ADJUDICATE PLAINTIFF'S CLAIMS UNDER THE FCRA** ........................................66

**CONCLUSION** ............................................................................67

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Abusaab v. Equifax Info. Servs., LLC,*
  2006 WL 1214782 (E.D. Pa. May 4, 2006) ........................................................... 62

*Agosta v. Inovision, Inc.,*
  2003 WL 22999213 (E.D. Pa. Dec. 16, 2003) ............................................... 43-44, 50

*Anderson v. Conwood Co.,*
  34 F. Supp. 2d 650 (W.D. Tenn. 1999) .................................................................. 57

*Anderson v. United Finance Co.,*
  666 F.2d 1274 (9th Cir. 1982) .............................................................................. 54

*Bach v. First Union Nat. Bank,*
  149 Fed. Appx. 354 (6th Cir. 2005) ................................................................ 56, 60

*Boris v. Choicepoint Servs., Inc.,*
  249 F. Supp. 2d 851 (W.D. Ky. 2003) ............................................................. 56, 57

*Bryant v. TRW, Inc.,*
  689 F.2d 72 (1982) .............................................................................................. 55

*Cairns v. GMAC Mortg. Corp.,*
  2007 WL 735564 (D. Ariz. Mar. 5, 2007) ......................................................... 59-60

*Campbell v. Experian Info. Solutions, Inc.,*
  2009 WL 3834125 (W.D. Mo. Nov. 13, 2009) ....................................................... 63

*Cortez v. Trans Union, LLC,*
  617 F.3d 688 (3d Cir. 2010) ......................................................................... *passim*

*Cousins v. Trans Union Corp.,*
  246 F.3d 359 (5th Cir. 2001) ............................................................................... 59

*Crane v. Trans Union, LLC,*
  282 F. Supp. 2d 311 (E.D. Pa. 2003) (Dalzell, J.) ........................................... *passim*

*Curtis v. Trans Union,*
  2002 WL 31748838 (N.D. Ill. Dec. 9, 2002) .................................................... 43-44

*Cushman v. Trans Union, LLC,*
  115 F.3d 220 (3d Cir. 1997) ................................................................ 55-56, 61, 62

*Dalton v. Capital Associated Industries, Inc.*,
   257 F.3d 409 (4th Cir. 2001) ............................................................ 54

*DiPrinzio v. MBNA America Bank, N.A.*,
   2004 WL 2039175 (E.D. Pa. Aug. 24, 2005) ............................ 44, 46, 62

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985) .................................................................... 53-54

*Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co.*,
   312 U.S. 410 (1941) .......................................................................... 61

*Evantash v. G.E. Capital Mortg. Servs., Inc.*,
   2003 WL 22844198 (E.D. Pa. Nov. 25, 2003) ............................. *passim*

*Fischl v. General Motors Acceptance Corp.*,
   708 F.2d 143 (5th Cir. 1983) ............................................................ 54

*Frett v. Government of Virgin Islands*,
   839 F.2d 968 (3d Cir. 1988)............................................................. 61

*Gorman v. Wolpoff & Abramson, LLP*,
   584 F.3d 1147 (9th Cir. 2009) ...................................................... *passim*

*Guimond v. Trans Union Cred. Info. Co.*,
   45 F.3d 1329 (9th Cir. 1995) ....................................................... *passim*

*Healey v. Catalyst Recovery of Pennsylvania, Inc.*,
   616 F.2d 641 (3d Cir. 1980)........................................................ 61-62

*Hoffman v. Sterling Drug, Inc.*,
   485 F.2d 132 (3d Cir. 1973)............................................................ 62

*In re Benson*,
   445 B.R. 445 (Bankr. E.D. Pa. 2010) ............................................... 46

*In re Unisys Savings Plan Litig.*,
   74 F.3d 420 (3d Cir. 1996)............................................................... 42

*Johnson v. MBNA America Bank, NA*,
   357 F.3d 426 (4th Cir. 2004) ................................................... 50, 51-52

*Koropoulos v. Credit Bureau, Inc.*,
   734 F.2d 37 (D.C. Cir. 1984).......................................................... 43

*Lawrence v. Trans Union, LLC*,
  296 F. Supp. 2d 582 (E.D. Pa. 2003) ..................................................... 56, 59, 60, 62

*Lukens v. Dunphy Nissan, Inc.*,
  2004 WL 1661220 (E.D. Pa. Jul. 26, 2004) ............................................................ 56

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991) ................................................................................................ 61

*Miller v. Indiana Hosp.*,
  843 F.2d 139 (3d Cir. 1988) *cert. denied*, 488 U.S. 870 (1988) ............................. 42

*Millstone v. O'Hanlon Reports, Inc.*,
  528 F.2d 829 (8th Cir. 1976) .................................................................... 54, 55, 56

*Montclair v. Ramsdell*,
  107 U.S. 147 (1883) ................................................................................................ 61

*O'Donnell v. United States*,
  891 F.2d 1079 (3d Cir. 1989) .................................................................................. 42

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
  998 F.2d 1224 (3d Cir. 1993) *cert. denied*, 510 U.S. 994 (1993) ............................ 42

*Philbin v. Trans Union Corp.*,
  101 F.3d 957 (3d Cir. 1996) ....................................................................... 53, 56, 60

*Rothery v. Trans Union, LLC*,
  2006 WL 1720498 (D. Or. Apr. 6, 2006) ......................................................... 60, 62

*Safeco Ins. Co. of America v. Burr*,
  551 U.S. 47 (2007) .......................................................................................... *passim*

*Sarver v. Experian Info. Solutions*,
  390 F.3d 969 (7th Cir. 2004) .................................................................................. 49

*Saunders v. Branch Banking and Trust Co. of VA*,
  526 F.3d 142 (4th Cir. 2008) .......................................................................... *passim*

*Scheel-Baggs v. Bank of America*,
  575 F. Supp. 2d 1031 (W.D. Wis. 2008) ................................................................ 46

*Shames-Yeakel v. Citizens Financial Bank*,
  677 F. Supp. 2d 994 (N.D. Ill. 2009) .............................................................. *passim*

*Sheffer v. Experian Info. Solutions, Inc.*,
  2003 WL 21710573 (E.D. Pa. July 24, 2003)............................................................ 56, 62-63

*Sloane v. Equifax Info. Servs. LLC*,
  510 F.3d 495 (4th Cir. 2007) ....................................................................................... 57

*Stevenson v. TRW Inc.*,
  987 F.2d 288 (5th Cir. 1993) ....................................................................................... 56

*Thomas v. Trans Union*,
  Civ. No. 00-1150 (D. Or. 2002)................................................................................... 56

*Thompson v. San Antonio Retail Merchants Assn.*,
  682 F.2d 509 (5th Cir. 1982) .................................................................................... 56-57

*Time, Inc. v. Hill*,
  385 U.S. 374 (1967)...................................................................................................... 61

*Wantz v. Experian Info. Solutions*,
  386 F.3d 829 (7th Cir. 2004) ....................................................................................... 59

*Wetzel v. Tucker*,
  139 F.3d 380 (3d Cir. 1998)......................................................................................... 42

*Whitfield v. Radian Guaranty, Inc.*,
  501 F.3d 262 (3d Cir. 2007)...................................................................................... 62-63

*Zamora v. Valley Fed. Sav. & Loan Assn. of Grand Junction*,
  811 F.2d 1368 (10th Cir. 1987) ................................................................................... 57

## STATUTES & RULES

15 U.S.C. § 1681p.......................................................................................................... 66

15 U.S.C. § 1681s-2(b) ......................................................................................... *passim*

47 U.S.C. § 258 ....................................................................................................... 16, 67

47 C.F.R. § 64.1120 ...................................................................................................... 16

47 C.F.R. § 64.1140 ...................................................................................................... 16

Fed. R. Civ. P. 56(a) ..................................................................................................... 42

## ADMINISTRATIVE ORDERS

*In the Matter of AT&T Communications, Inc.*,
  FCC 00-446 (Dec. 21, 2000)..................................................................... 16, 16-17, 17

*In the Matter of AT&T Communications, Inc.*,
  FCC 01-254 (Sept. 11, 2001) .................................................................... 17

*In the Matter of AT&T Communications, Inc.*,
  FCC 07-4779 (Nov. 30, 2007) ................................................................... 17

*In the Matter of AT&T Communications, Inc.*,
  DA 08-784 (Apr. 2, 2008)......................................................................... 17

*In the Matter of AT&T Communications, Inc.*,
  DA 08-812 (Apr. 4, 2008)......................................................................... 17-18

*In the Matter of AT&T Communications, Inc.*,
  DA 08-1050 (May 2, 2008) ....................................................................... 18

*In the Matter of AT&T Communications, Inc.*,
  DA 08-1117 (May 14, 2008) ..................................................................... 18

*In the Matter of AT&T Communications, Inc.*,
  DA 09-1952 (Aug. 31, 2009)..................................................................... 23

## OTHER AUTHORITY

116 Cong. Rec. 36570 (1970) (Rep. Sullivan)............................................. 55

http://www.fcc.gov.slamming ..................................................................... 16

## PRELIMINARY STATEMENT

AT&T Corp.'s ("AT&T's") Motion for Summary Judgment fails handily in all respects. Disputed issues of material facts abound with respect to each and every subject raised by AT&T in the instant motion, including: (1) AT&T's reporting of inaccurate information in responding to Plaintiff's credit reporting disputes; (2) the meritorious nature of Plaintiff's disputes; (3) AT&T's failure to report the account at issue as "disputed"; (4) AT&T's failure to conduct a reasonable investigation; (5) Plaintiff's claims for actual damages; and (6) AT&T's willful violation of the FCRA.

Additionally, AT&T's claim that it has no legal responsibility to report an account as "disputed" in connection with responding to a credit reporting dispute is simply without any legal foundation whatsoever. On the contrary, two federal appeals courts (the Fourth Circuit in *Saunders v. Branch Banking and Trust Co. of VA*, 526 F.3d 142 (4th Cir. 2008), and the Ninth Circuit in *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. 2009), discussed *infra*) in well-reasoned opinions have reached the exact opposite conclusion holding not only that a credit furnisher such as AT&T is indeed obliged to report an account as "disputed" when responding to a credit reporting dispute, but also that its failure to do so may constitute a willful violation of the FCRA thus entitling a plaintiff to punitive damages.

AT&T's final argument, that this matter should be transferred to the Federal Communications Commission ("FCC") is plainly frivolous considering that the only claim pending in this lawsuit is for AT&T's violations of the Fair Credit Reporting Act, 15 U.S.C §§ 1681 *et seq.* ("FCRA") which provides this Court with explicit jurisdiction under 15 U.S.C. § 1681p.  Furthermore, the FCC has no regulatory or enforcement authority under the FCRA.

AT&T has not offered a single circumstance where material disputes of fact do not exist. The claims at issue as such are not appropriate for summary judgment, and instead are ripe to be presented to a jury.  AT&T's motion should thus be denied in its entirety.

## PLAINTIFF'S RESPONSE TO AT&T'S STATEMENT OF MATERIAL FACTS

1.      Plaintiff objects on the grounds that the statement is immaterial to claims at issue. Subject to the foregoing objection, Plaintiff can neither admit nor deny the AT&T statement of its own corporate organization.

2.      Plaintiff objects on the grounds that the statement is immaterial to claims at issue. Subject to the foregoing objection, Plaintiff denies the statement as unsupported. Upon reviewing AT&T's reference to an internet website, the page returned the following information: "The page you have accessed is no longer available at this address."

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Plaintiff objects on the grounds that the statement is immaterial to claims at issue. Subject to and without waiving the foregoing objection, the statement is admitted.

7.      Plaintiff objects on the grounds that the statement is immaterial to claims at issue. Subject to and without waiving the foregoing objection, the statement is admitted.

8.      Admitted in part and denied in part. Plaintiff admits that he has not seen a therapist or medical professional for treatment of the emotional distress he suffered.  The remainder of the statement is denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 61-66.

9.      Plaintiff objects on the grounds that the statement is immaterial to claims at issue. Subject to and without waiving the foregoing objection, Plaintiff can neither admit nor deny AT&T's statement of its own write off policies.

10.     Admitted in part and denied in part.  Plaintiff admits that "write-off" and "charge-off" have been used interchangeably in connection with this lawsuit.   The remainder of the statement is denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 39-41.

11.     Plaintiff objects on the grounds that the statement presented is not material to claims at issue.  Subject to and without waiving the foregoing objection, Plaintiff can neither admit nor deny AT&T's statement of its own write-off policies.

12.     Plaintiff objects on the grounds that the statement is immaterial to claims at issue. Subject to and without waiving the foregoing objection, the statement is denied as unsupported by materials cited.

13.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 34-35.

14.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 47.

15.     Admitted in part and denied in part.  Plaintiff admits only that NCO responds to disputes on AT&T's behalf.  The remainder of the statement is denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 47-60.

16.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 56.

17.     Denied.   Plaintiff object on the grounds that AT&T has failed to provide a foundation that documents identified as purportedly containing AT&T procedures were ever relied upon in responding to Plaintiff's credit reporting disputes. Subject to the foregoing objection, Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 47-66.

18.     Denied.   Plaintiff refers the Court to his objections set forth in paragraph 17. Plaintiff further refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 47-60.

19.     Denied.   Plaintiff refers the Court to his objections set forth in paragraph 17. Plaintiff further refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 37-38, 53.

20.     Denied.   Plaintiff refers the Court to his objections set forth in paragraph 17. Plaintiff further refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 52-66.

21.     Denied as stated. Plaintiff refers the Court to his objections set forth in paragraph 17. Plaintiff further refers the Court to Plaintiff's counter-statement of material facts at ¶ 53.

22.     Denied. Plaintiff refers the Court to his objections set forth in paragraph 17. Plaintiff further refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 52-60.

23.     Denied. Plaintiff further refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 39-42, 54.

24.     Denied. Plaintiff refers the Court to his objections set forth in paragraph 17. Plaintiff further refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 47-60.

25.     Plaintiff objects on the grounds that the statement is immaterial to claims at issue. Subject to and without waiving the foregoing objection, the statement is admitted.

26.     Admitted.

27.     Admitted.

28.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 6-10.

29.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 6-10, 29-30.

30.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 6-10, 29-30.

31.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 6-16.

32.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 1-16, 29-30.

33.     Admitted.

34.     Admitted in part denied in part. Plaintiff admits only that he or his family made the telephone calls identified.  The remainder of the statement is denied.  Plaintiff further refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 6-10.

35.     Admitted in part denied in part. Plaintiff admits only that he or his family made the telephone calls identified.  The remainder of the statement is denied.  Plaintiff further refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 6-10.

36.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 6-16.

37.     Plaintiff objects that the statement is immaterial to the claims at issue.   The statement sets forth a legal conclusion to which no response is required.  To the extent a response is required the statement is denied.

38.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 1-17, 29-30.

39.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 1-17, 29-30.

40.     Plaintiff objects to the statement as unsupported by the materials cited.  Subject to the foregoing objection, the statement is denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 1-17, 29-30.

41.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 4, 11-17.

42.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 4, 11-17.

43.     Plaintiff objects on the grounds that the statement presented is not material to claims at issue. Subject to the foregoing objection, the statement is admitted.

44.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 11-17.

45.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 11-17.

46.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 1-5, 18.

47.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 11-17.

48.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 21-22.

49.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 11-17, 21-22.

50.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 23.

51.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 18-32.

52.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 18-32.

53.     Denied.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 27-33.

54.     Plaintiff objects to the statement as unsupported by the materials cited.  Subject to the foregoing objections the statement is denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-46.

55.     Denied.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 45-46.

56.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-46.

57.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 24.

58.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 24.

59.     Denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 24.

60.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 24.

61.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-46.

62.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

63.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

64.     Plaintiff objects on the grounds that the statement is immaterial to claims at issue. Subject to the foregoing objection, the statement is denied as stated.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 34.

65.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 35.

66.     Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 35.

67.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 35.

68.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 33.

69.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

70.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

71.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

72.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

73.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

74.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 34.

75.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 34-35.

76.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

77.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

78.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

79.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

80.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

81.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 34.

82.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶ 33.

83.     Denied as stated.   Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-35.

84.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

85.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

86.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

87.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

88.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

89.     Denied.  Plaintiff refers the Court to Plaintiff's counter-statement of material facts at ¶¶ 33-60.

<u>**PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS**</u>

**A. Plaintiff Never Had Any Contractual Relationship With AT&T.**

1.      At all time relevant hereto, including but not limited to April 2007 and May 2007, Plaintiff had contracted with the long distance telephone provider IDT to provide long distance service in his home.  *See* Ex. 1, February 24, 2011 Deposition of Dennis Van Veen ("Van Veen Dep."), at 40:8-12.

2.      AT&T does not provide Plaintiff with any telephone, cellular phone or internet service at all, and has no contractual relationship whatsoever with Plaintiff:

> *Q.   Are you aware of any contract that Mr. Van Veen signed with AT&T in order for AT&T to provide him with long distance or international telephone services?*
>
> *A.   Not that I'm aware of.*

Ex. 2, February 17, 2011 Deposition of AT&T Corporate Designee Stephen Samaroo ("Samaroo Dep."), at 213:7-11.

3.      Plaintiff further did not at any time authorize that his long distance service be changed from IDT to AT&T:

> *Q.   Are you aware of any document that Mr. Van Veen signed authorizing that his long distance or international phone service be changed from IDT to AT&T?*
>
> *A.   Not that I'm aware.*
>
> *[Objection omitted]*
>
> *Q.   Are you aware of any voice recording at all where Mr. Van Veen orally authorized the change of his long distance or international telephone service from IDT to AT&T?*
>
> *A.   Not that I'm aware of.*

*Id.* at 213:12-23.

4.     Notwithstanding the above, AT&T attempted to charge Plaintiff $202.18 for long distance calls placed from Plaintiff's home telephone number between April 28, 2007 and May 25, 2007. *See* Ex. 3, AT&T Statement Ending May 16, 2007; Ex. 4, AT&T Statement Ending June 16, 2007.

5.     AT&T's course of conduct and dealings with Plaintiff confirm that AT&T falsely opened a permanent long-distance account in Plaintiff's name in April 2007 and otherwise treated Plaintiff as though he had become an AT&T customer:

> (*Mr. Samaroo discussing AT&T's call log related to instances where Plaintiff contacted AT&T*)
>
> Q.   *Does Type P mean it's a phone call?*
>
> A.   *No.*
>
> Q.   *What does Type P mean?*
>
> A.     *P can mean if it's a permanent -- if it's a permanent -- the appeal -- P can mean it's permanent and X is temporary.*
>
> Q.    *So then to follow up here, Item Number 5 that we've marked on these exhibits has a Type P?*
>
> A.   *Right.*
>
> Q.   *Correct?*
>
> A.   *Correct.*
>
> Q.   *And P represents that it's a permanent account?*
>
> A.   *It can.*

Ex. 2, Samaroo Dep., at 235:16-236:5.

> Q.    *Does [the AT&T Statement (Ex. 30) look like a bill or a statement that an AT&T customer would have received in the normal course of business in or around May of 2007?*
>
> A.   *Looks like it.*

12

*Q.     Do you see anything in [Exhibit 30] that would distinguish this statement from a statement that an AT&T customer would receive?*

*A.   Not to my knowledge.*

*Q.   Does it have a customer ID on it?*

*A.   Yes.*

*Q.     Is the customer ID something that actual AT&T customers receive in connection with their account with AT&T?*

*A.   Yes.*

*Id.* at 208:7-21. *See also id.* at 208:22-209:20; 210:10-212:9; 214:14-215:18; 216:1-4; 216:17-217:10.

*(IDT Corporate Designee Discussing Information Needed For Billing)*

*Q.   What is a "CDR"?*

*A.   A call record.*

*Q.   When you say "a call record," is this the data of when a person places a call or receives a call?*

*A.   I think it stands for "call detail record."*

*Q.   Is that the data about when a person places a call and receives a call?*

*A.   Yes.*

*Q.   And is that the data that a company like IDT or AT&T would use to generate a bill?*

*A.   Yes.*

*               *   *   *

*Q. But you know that IDT can't create a bill without the CDR?*

*A.   Correct.  We get a file from AT&T, or from whoever we get a file, but how it gets generated I don't know.*

*Q.   So the CDR information comes from AT&T?*

13

*A.   Yes.*

*Q.   So in order for IDT to properly bill its customers, AT&T needs to send the CDR information over to IDT?*

*A.   Yes.*

*Q.   And according to [IDT Incident Notes (Ex. 6)] AT&T stopped sending CDR information for customers who were subjected to this problem?*

*[ Objection omitted]*

*A.   Yes.*

Ex. 5, March 30, 2011 Deposition of IDT Corporate Designee Shalom Shaya Schwartz ("Schwartz Dep."), at 59:9-19; 60:2-16.

**B.   AT&T's Network "Shutdown" Caused A Widespread Problem Resulting In IDT Customers Having Their Long Distance Service Transferred To AT&T Without Their Permission.**

6.      IDT as a reseller of long distance service contracted with AT&T to use AT&T's network to place long-distance telephone calls for its customers.  *See* Ex. 5, Schwartz Dep., at 10:15-11:12.

7.      In or around early 2007, AT&T instituted a shutdown of a portion of its network which was assigned to IDT.  *See* Ex. 6, IDT Incident Notes.

8.      The AT&T network shutdown caused widespread interruption of IDT customer's long distance telephone subscriptions resulting in these customers becoming inappropriately designated as AT&T long-distance customers including Plaintiff. *See id.* (identifying approximately 500 reported incidents by November 2007);  Ex. 5, Schwartz Dep., at 32:21-33:7; 45:5-11.

9.      IDT has confirmed that the problems experienced by Plaintiff and hundreds if not thousands of IDT customers was caused by AT&T:

*Q.   Is it your understanding that the problem with migrating these customers from the original [network] to the new [network] was a problem that was being caused by AT&T or IDT?*

*[Objection omitted]*

*A.   I don't think it was IDT's fault.*

*Q.   Okay.   So as we sit here today, it would be your understanding that the problem with migrating these customers was originating with AT&T?*

*A.   That's correct.*

Ex. 5, Schwartz Dep., at 42:13-43:2.

      10.   Moreover, AT&T was also actively aware of the problem and failed to take proactive measures to resolve it:

(*from IDT's Incident Notes*)

- *Shaya also had established a dialogue with AT&T contacts to start addressing the bills . . .*

- *Shaya and I discussed [an IDT customer who was inappropriately billed $27,000 by AT&T] and we tried several avenues to get AT&T to take some responsibility but they refused . . . we escalated this bill to Shaya's AT&T contacts and started a dialogue about this account and the others that were coming in rapidly.*

- *During this time we started having conference calls with AT&T management and AT&T Technical management….we started sharing the spreadsheet [of IDT customers who were being inappropriately billed by AT&T] and more often when we needed our AT&T team.*

- *The spreadsheet has grown to over 500 [telephone numbers] that had the billing issue.*

- *At a certain point we made the decision to [migrate] customers that called with a bill to Global Crossing as we did not feel that AT&T was being proactive enough to resolve their issue.*

- *[As of November 9, 2007] Problem is there are still new bills [of IDT customers being inappropriately billed by AT&T].*

*See* Ex. 6, IDT Incident Notes.

### C. AT&T's Billing Of Plaintiff Unambiguously Constituted An Illegal Act Of "Slamming."

11.     The Federal Communication Commission ("FCC") defines "slamming" as the illegal practice of switching a consumer's traditional wireline telephone company for local, local toll, or long distance service without permission." http://www.fcc.gov/slamming.  *See also* 47 U.S.C. § 258; 47 C.F.R. § 64.1120.

12.     The FCC further describes a consumer's recourse when slamming occurs:

> under FCC rules, don't have to pay for the first 30 days of its service. Call your authorized company to inform it of the slam, and that you want to be switched back with the same calling plan you had before the slam. . . **If you have been slammed but HAVE NOT paid the bill of the slamming company,** you DO NOT have to pay the slamming company for up to 30 days after being slammed. You also do not have to pay your authorized telephone company for any charges for up to 30 days.

http://www.fcc.gov/slamming (capitalization in original) (bold facing added).  *See also* 47 C.F.R. § 64.1140.

13.     Between January 1, 2000 and September 22, 2000, the FCC received 1,143 complaints alleging that slamming had been committed by AT&T.  *See* Ex. 7, *In the Matter of AT&T Communications, Inc.,* FCC 00-446, n.9 (Dec. 21, 2000).

14.     As the FCC has explained to AT&T when taking action upon the thousands of complaints it received in 2000, slamming exists regarding of the slamming company's intent:

> AT&T attributes it conversions of these consumers' six lines to inadvertent error or mistake. Even if we accept at face value AT&T's statement that these conversion were due to error or mistake, however, neither the Act nor our rules require specific intent to violate the statute of rules.  The Commision has stated:
>
>> holding carriers liable for both inadvertent and intentional unauthorized changes to subscriber's preferred carriers will reduce the overall incidence of slamming and is consistent with 258. We find that the rights of the consumer and the authorized carrier to remedies for slamming should not be affected by whether the slam was an intentional or accidental act. Regardless of the intent, or

lack thereof, behind the unauthorized change, the consumer and
the authorized carrier have suffered injury.

Because the Act and our rules do not require us to find that a carrier had specific
intent to violate the Act or our rules , we therefore find AT&T apparently liable
for the unauthorized conversion of the six telephone lines identified by these six
complaints.

*Id.* at 7 (citations omitted).

15.      As a result of the FCC's 2000 investigation of AT&T's slamming practices, the

FCC fined AT&T $640,000.  *See id.* at 16.[1]

16.      The FCC has likewise repeatedly found that AT&T had committed slamming in

connection with AT&T's network shutdown affecting IDT customers under identical

circumstances to that of Plaintiff:

 (a) *September 21, 2007  IDT Customer Slamming Complaint*

"AT&T states in its response that due to a data processing error . . . calls were
sent across AT&T network as if the were normal casual usage. We find that
AT&T has failed to produce clear and convincing evidence that the Complainant
authorized a carrier change.

**We have determined that Complainant is entitled to absolution for the
charges incurred during the first thirty days after the unauthorized change
occurred that neither AT&T nor IDT may peruse any collection against
Complainant for those charges."**

Ex. 9, *In the Matter of AT&T Corporation*, DA 07-4779, at 3 (Nov. 30, 2007) (emphasis added).[2]

 (b) *October 3, 2007 IDT Customer Slamming Complaint*

"Because AT&T has not provided proof of customer authorization in its response
to Complainant's complaint, we find that AT&T has failed to produce clear and
convincing evidence that the Complainant authorized a carrier change.

---

[1] Upon reconsideration the FCC revised its fine of AT&T to $520,000.  *See* Ex. 8, *In the Matter of
AT&T Communications, Inc.*, FCC 01-254, at 1 (Sept. 11, 2001).

[2] Upon reconsideration the FCC affirmed it order. *See* Ex. 10, *In the Matter of AT&T Corporation*,
DA 08-784, at 3 (Apr. 2, 2008).

> 'We have determined that Complainant is entitled to absolution for the charges incurred during the first thirty days after the unauthorized change occurred that neither AT&T nor IDT may peruse any collection against Complainant for those charges."

Ex. 11, *In the Matter of AT&T Corporation*, DA 08-812, at 3 (Apr. 4, 2008).

> (c)     *October 5, 2007 IDT Customer Slamming Complaint*

> "AT&T states in its response that due to a data processing error . . . calls were sent across AT&T network as if the were normal casual usage. We find that AT&T has failed to produce clear and convincing evidence that the Complainant authorized a carrier change.

> We have determined that Complainant is entitled to absolution for the charges incurred during the first thirty days after the unauthorized change occurred that neither AT&T nor IDT may peruse any collection against Complainant for those charges."

Ex. 12, *In the Matter of AT&T Corporation*, DA 08-1050, at 3 (May 2, 2008).

> (d)     *December 3, 2007,  December 26, 2007 and February 8, 2008 Consolidated  IDT Customer Slamming Complaints*

> "Because AT&T has not provided proof of customer authorization in its response to Complainant's complaint, we find that AT&T has failed to produce clear and convincing evidence that the Complainant authorized a carrier change.

> 'We have determined that Complainant is entitled to absolution for the charges incurred during the first thirty days after the unauthorized change occurred that neither AT&T nor IDT may peruse any collection against Complainant for those charges."

Ex. 13, *In the Matter of AT&T Corporation*, DA 08-1117, at 3 (May 14, 2008).

17.     Plaintiff accordingly bore no responsibility to pay any of the charges that AT&T assessed against him.  Indeed, Plaintiff should have been absolved of any responsibility for the charges levied by AT&T when AT&T first learned it had improperly billed Plaintiff for the long distance calls and likewise discontinued all collection activities against Plaintiff.  *See* Exs. 8-13.

18

**D.  Plaintiff Repeatedly Requested Absolution From The Illegal Charges Levied By AT&T.**

18.     Upon receipt Plaintiff's first telephone complaint requesting that the charges be retracted, AT&T reduced the charges to $63.33 but refused to absolve Plaintiff of the charges and continued its collection activities.  *See* Ex. 14, AT&T Printout Statement Ending July 16, 2007.

19.     Thereafter, Plaintiff wrote to AT&T again complaining that the charges should be retracted.  *See* Ex. 15, August 18, 2007 Letter to AT&T.

20.     AT&T did not respond to Plaintiff's letter and continued its collection activities against Plaintiff issuing a final statement to Plaintiff in the amount of $64.12.  *See* Ex. 16, AT&T Statement Ending August 16, 2007.

21.     AT&T then proceeded to wage a debt collection campaign against Plaintiff. First, AT&T referred the debt to collection agencies which dunned Plaintiff with letters and repeatedly called Plaintiff at home.  *See* Ex. 17, September 11, 2007 GC Services Collection Letter; Ex. 1, Van Veen Dep., at 54:7-56:13.

22.     Plaintiff again wrote a letter to the assigned debt collector requesting that collection activities against him stop immediately advising that the he did not owe any money to AT&T.  AT&T, however, again refused to retract the charges.  *See* Ex. 18, September 25, 2007 letter to GC Services; Ex. 19, Relevant Portions of AT&T DPS Notes (referring to the items marked 5,6,7 by AT&T witness Stephen Samaroo); Ex. 20, June 16, 2011 Deposition of AT&T Corporate Designee Rebecca Raso ("Raso Dep."), at 185:19-189:23.

23.     Thereafter, on or about December, 26 2007, AT&T wrote-off the purported debt and then falsely reported the debt as a derogatory charged-off account to the national credit reporting agencies, Trans Union, Equifax and Experian.  *See* Ex. 2, Samaroo Dep., at 171:21-

172:2; Ex. 21, AT&T RAATS Notes (referring to the line item at 12/26/07); *See*, *e.g.*, Ex. 22, Plaintiff's April 1, 2009 Experian Credit File Disclosure (indicating the AT&T Credit Management Account had been reported since January 2008).

24.    In or around December 2008, Plaintiff learned that he would receive a higher interest rate (7.75% vs. 7.25%) on a $30,000 fixed equity loan that he had applied for with Navy Federal Credit Union ("NFCU") because of the derogatory AT&T account appearing on his credit report. *See* Ex. 23, April 12, 2011 Deposition of Navy Federal Credit Union Representative Minder Singh ("Singh Dep."), at 8:12-22:22; Ex. 24, Plaintiff's NFCU Loan Application; Ex. 25, November 14, 2008 Credit Report Delivered to NFCU; Ex. 26, November 14, 2008 NFCU Disclosure Letter; Ex. 27, NFCU Fixed Equity Loan Rate Sheet; Ex. 28, NFCU Loan Note.

25.    Upon learning of derogatory account now appearing on his otherwise perfect credit report, Plaintiff waged a series of disputes with the Pennsylvania Attorney General and the Pennsylvania Public Utilities Commission again seeking absolution from the illegal charges levied by AT&T and not placed by AT&T on his credit record. *See* Ex. 29, Printout of Plaintiff's Complaint to Public Utility Commission; Ex. 1, Van Veen Dep., at 29:17-23; 107:2-110:10.

26.    AT&T, however, once again refused to retract the charges. *See* Ex. 30, December 23, 2008 Letter from AT&T Representative Donald Behler To Plaintiff; Ex. 31, January 13, 2009 Letter from Office of the Attorney General to Plaintiff.

**E.  Plaintiff Filed A Slamming Complaint With The FCC In Order To Obtain Absolution From The Illegal Charges Levied By AT&T.**

27.    Plaintiff sought further assistance from the FCC and filed a slamming complaint against AT&T. *See* Ex. 32, March 5, 2009 FCC Notice of Informal Complaint.

28.     AT&T responded to the FCC complaint by letter, dated March 25, 2009, advising the FCC that the on March 12, 2009 AT&T had "adjusted" Plaintiff's balance to $0.  *See* Ex. 33, March 25, 2009 Letter from AT&T Representative Margaret Berry to FCC.

29.     AT&T also notably provided a knowingly false account of the circumstances that gave rise to Plaintiff's problem by claiming that "IDT did not communicate any carrier change to Dennis Van Veen's Local Exchange Carrier."  *Id*. at 2. *Compare id. with* Ex. 34, July 24, 2009 Letter from IDT Representative Nadine Duhamel to FCC.

30.     On the contrary, IDT in fact repeatedly attempted to migrate Plaintiff's account from the old AT&T network to the new AT&T network.  *See* Ex. 35, IDT Account Information (referring to line items dated January 5, 2007 and February 23, 2007 confirming IDT's repeated attempt to migrate Plaintiff's account to the new network; Ex. 5, Schwartz Dep., at 98:20-99:6.

*(IDT Representative Shaya Schwartz discussing the February 23, 2007 line items)*

*Q.   And then we see on 2/23/2007 at 12:09 p.m. the same message that we saw previously, "Customer migrates to 5438.  IDT handling carrier change charge.  A charge should not appear on the customer bill."*

*A.  Correct.*

*Q.  Do you see that?*

*A.  Yes.*

*Q.   Okay.  So it looks like the computer system again  tried to migrate Mr. Van Veen's number to the [new network].*

*A.  Yes.  And that is an issue that we experienced at the time, where it seems like customers were not migrating as we thought they would be.*

*Q.   Okay.  To your knowledge, did any of that migration problem have to do with something IDT was doing wrong?*

*A.  Not that I am aware of.*

*Id*. at 101:23-102:14.

*(Mr. Schwartz discussing March 25, 2009 Letter submitted by AT&T to the FCC)*

*Q.   I'll read it to you.  It says, "On 4/23/2007 AT&T received notification from IDT that they were no longer utilizing the AT&T SDN platform to provide service to telephone number 215-322-4459."  Do you see that sentence?*

*A.   Yes.*

*Q.   Is "215-322-4459" Mr. Van Veen's telephone number?*

*                              *   *   **

*A.   Actually, if I look at that screen shot.  (Witness reviewing document.)  Yes.*

*Q.   Do you have any knowledge that IDT ever told AT&T that they were not using the SDN platform to provide service on that number?*

*A.   No knowledge.*

*Q.   So to your knowledge, that statement would be false?*

*[Objection omitted]*

*A:   I have no knowledge of IDT informing AT&T that it's not going to use the SDN network.*

*                              *   *   **

*Q.   It says, "Since IDT was no longer claiming this account as a re-sale account the billing for this subscriber defaulted to AT&T."  Do you see that?*

*A.   (Witness reading document.)  Yes, I do.*

*Q.   Do you have any knowledge that IDT ever stopped claiming that Mr. Van Veen had an account with AT&T -- with IDT?*

*A.   I have no knowledge of IDT claiming that Mr. Van Veen should no longer be an IDT customer.*

*Q.   So, again, this statement as well also contradicts your own understanding of IDT's position on this?*

*[Objection omitted]*

*A.   I have no knowledge of IDT telling Mr. Van Veen that they're no longer a customer of IDT.*

22

*   *   *

*Q. Is it fair to say that Miss Duhamel's account of what happened here is strikingly different from the account provided by AT&T in this letter?*

*[Objections omitted]*

*A. Yes.*

Ex. 5, Schwartz Dep., at 131:5-132:5, 140:8-23, 142:17-23.

31.     Notwithstanding AT&T misrepresentations to the FCC in its response, the FCC subsequently issued and order relying upon the representations in AT&T letter that "AT&T . . . has taken action to resolve the Complaint . . . . AT&T has **fully absolved** the Complainant of all charges assess by AT&T in a manner consistent with the Commission's liability rules." *See* Ex. 36, *In the Matter of AT&T, Inc.*, DA 09-1952, at 1,3 (Aug. 31, 2009) (emphasis added).

32.     Moreover, AT&T issued a statement to Plaintiff in March 2009 confirming that he had a $0 balance and further confirmed the adjustment was "due to incorrect AT&T billing."




*See* Ex. 37, AT&T Statement Ending March 16, 2009 (account number redacted).

23

### F. AT&T Continued To Report The Derogatory Account To The Credit Reporting Agencies Despite Allegedly Absolving Plaintiff Of Responsibility For The Debt.

33.     When Plaintiff began the process of applying for a purchase mortgage in April 2009, he learned that AT&T was continuing to report the derogatory account on his credit report, which was the solitary delinquency on his credit report.



Ex 22 (account number redacted).

34.     Plaintiff was thus forced to wage disputes through the credit reporting agencies Experian, Equifax and Trans Union in order to correct the inaccurate reporting.  *See* Ex. 38, April 20, 2009 Letter Dispute to Experian; Ex. 39, April 20, 2009 Letter Dispute to Trans Union; Ex. 40, August 11, 2009 Letter Dispute to Equifax.

35.     Pursuant to the requirements under the Fair Credit Reporting Act ("FCRA"), each of the credit reporting agencies forwarded Plaintiff's dispute to AT&T.  A form called an Automated Consumer Dispute Verification ("ACDV") exists to document the manner in which AT&T responded to each dispute.  *See* Ex. 41, Experian ACDV; Ex. 42, Trans Union ACDV; Ex. 43, Equifax ACDV; Ex. 20, Raso Dep., at 103:17-111:13; 113:11-117:7; 118:2-123:3.

36.     AT&T responded to each dispute with inaccurate information in four separate and equally actionable respects:

    (a)      AT&T failed to instruct the credit reporting agencies to delete the account entirely despite unambiguous evidence that Plaintiff does not and has never had an account with AT&T at all times material hereto;

    (b)      AT&T verified the account as a charged-off account despite unambiguous evidence that Plaintiff was absolved of any responsibility to pay AT&T and did not otherwise owe AT&T any money;

    (c)      AT&T failed to report that the account should be designated as "disputed" by the consumer despite a two year history of having disputed the account in addition to the instant credit reporting disputes;

    (d)      In connection with responding to the Plaintiff's dispute to Equifax, AT&T responded by falsely and inaccurately updating the account balance to indicate that Plaintiff somehow owed a presumably new balance of $10 to AT&T.

Ex. 44, June 15, 2011 Deposition of Equifax Representative Vicki Banks ("Banks Dep."), at 4:16-29:1; Ex. 45, June 14, 2011 Deposition of Experian Representative Jason Scott ("Scott Dep."), at 4:7-28:7; Ex. 46, June 24, 2011 Deposition of Trans Union Representative Steven Newnom, at 5:16-36:23; Ex. 20, Raso Dep., at 103:17-111:13; 113:11-117:7; 118:2-123:3.

    (1)    ***AT&T's Failure To Properly Investigate And Delete The Disputed Account Using The "Response Code."***

    37.    In connection with responding to a credit reporting dispute, AT&T is required to respond with a "response code," which instructs the credit reporting agencies whether or not to delete the account:

    *(Equifax Representative Vicki Banks discussing the Response Code)*

    *Q.*    *Are you familiar with what the significance of a response code is?*

*A.     Yes, I am.*

*Q.     Could you explain to me what its significance is.*

*A.     Sure.  The response code has four sections on the ACDV.  There is a section that says verify -- Excuse me -- "Verified As Reported."  That simply means that the information that is being transmitted over to the date furnisher, if they check that box, they are saying that the information that has been provided is accurate. The "Modify As Shown" means that they want to make a change, that is, the data furnisher. And then there is a delete box.  That simply says that they are asking the bureau to remove the item from the file. And there is a "Delete Fraud," which means that the data furnisher has deemed the account as fraud, and that is their reasoning for having the account removed.*

Ex. 44, Banks Dep., at 13:1-21.

38.     AT&T inaccurately failed to respond by requesting deletion in response to each

dispute:



*See* Ex. 41, Experian ACDV (personal information redacted).



*See* Ex. 42, Trans Union ACDV.



*See* Ex. 43, Equifax ACDV (account number redacted).

 (2) ***AT&T's Verification Of The Account As "Charged-Off" Using The "Account Status Code."***

 39. In connection with responding to a credit reporting dispute, AT&T is also required to respond with an "account status code":

*(Ms. Banks discussing the account status code)*

*Q. Do you understand what the significance of the account status block is?*

*A. Yes, I –*

*[Objection omitted]*

*A Yes, I do.*

*Q. Could you explain it to me.*

*A. The account status in the case would be the current status of the trade line that is being reported.*

*Q. When you say, "the current status," what you do mean by the status of the account?*

*A. The -- Well, I would have to say it this way.  It's the -- the disposition of the account.*

*Q. When you say "disposition," would it be fair to say that you're referring to whether or not the account is in good standing or is in some way derogatory?*

*A. Yes.*

Ex. 44, Banks Dep., at 19:12-20:7.

40.     One possible designation of the account is code 97 technically defined as "**Unpaid balance** reported as a loss by credit grantor (charge-off)." Ex. 47, Relevant Portion of System Interface Agreement, Account Status Codes (emphasis added).[3]

41.     A charge off is the most derogatory manner in which an credit account can be reported:

> (*Ms. Banks discussing the nature of a "charge-off"*)
>
> *Q   With respect to the term "charge off," is that an adverse term used for the status of the account?*
>
> *A.     Yes*
>
> *Q.     Okay.  And when you say it's an adverse term, does that mean that it has some negative indication regarding Mr. Van Veen's payment history with respect to the account?*
>
> *[Objection omitted]*
>
> *A.  Yes, it does.*
>
> *Q.   Okay.  Does a charged off account have the ability to negatively impact a consumer's credit score?*
>
> *[Objection omitted]*
>
> *A.  It could.  Yes.*
>
> *          \*   \*   \**
>
> *Q.  Is there any status code that Equifax uses that is more adverse than the charged off status?*
>
> *[Objections omitted]*
>
> *A.  No.*

Ex. 44, Banks Dep., at 22:7-22; 23:7-11.

---

[3]     It is important to note the definition of charge-off itself presupposes that the consumer has an unpaid balance which he was otherwise obliged to pay but did not do so.

28

42.     AT&T inaccurately responded to each dispute by verifying the account as "charged off":[4]



See Ex. 41, Experian ACDV.



See Ex. 42, Trans Union ACDV.



See Ex. 43, Equifax ACDV.

### (3)     AT&T's Failure To Report The Account As "Disputed" By The Consumer Using The "Compliance Condition Code."

43.     In connection with responding to a credit reporting dispute, AT&T is also required to update its reporting of the account to reflect that the account is "disputed" by the

---

[4]     ACDVs are designed to reflect what information the credit furnisher was originally reporting to the credit reporting agencies prior to the dispute, followed by the information that the furnisher now wishes to report after receiving notice of a dispute.  A blank item on an ACDV with respect to the original information indicates that the furnisher has not reported anything for that category.  A blank item on an ACDV when a furnisher decides to "Modify" the information on an account reflects that the furnisher does not wish to make any changes to that particular item of information.

consumer, which is done in the credit reporting industry by using the "compliance condition code":[5]

*(Ms. Banks discussing the "compliance condition code")*

*Q.        Okay.  Are you familiar with what the significance of the compliance condition code block is with respect to the document?*

*A.      Yes.*

*[Objection omitted]*

*Q.   Can you explain to me.*

*A.   This is the block where the data furnisher will tell us if there's anything they need to add to the trade line.*

\* \* \*

*Q.      Is one of the possible codes that could be entered into that box a code that would reflect that the consumer is disputing the accuracy of the accounts?*

*[Objection omitted]*

*A.  Yes.*

*Q   Okay.  And that's a standard code as part of the Metro 2 format.*

*A.  Yes, if they use that.*

Ex. 44, Banks Dep., at 16:24-18:8.  *See also* Ex. 47, System Interface Agreement (summarizing Metro 2 codes applicable to the compliance condition code.

44.      AT&T repeatedly failed to each dispute by failing to update the compliance condition code to reflect that the account is disputed by Plaintiff:

---

[5]        A discussion of AT&T's legal obligation to report an account as disputed by the consumer is set forth in Plaintiff's Argument at Section II. A.

| TRADE INFORMATION | | SUBSCRIBER RESPONSE | | | ON PROFILE | | |
|---|---|---|---|---|---|---|---|
| Acct Condition/Cumm Status: | | | | | | | |
| Act Status/Rating: | | 97 | | | CHARGE OFF | | |
| Payment Rating: | | | | | | | |
| CII: | ECOA: | | | | | | |
| Balance: | Balance Date: | | 1 | | 64 | 1 | |
| Amt Past Due: | | | 12/24/2007 | | 64 | 01/16/2008 | |
| Orig Delinq Date: | | 07/18/2007 | | | | | |
| Credit Limit/Orig Amt: | | | | | | | |
| High Credit Balance: | | | | | 64 | | |
| Charge Off Amt: | | 64 | | | 64 | | |
| Sch Monthly Pay: | Act Pay: | | | | | | |
| Portfolio Name: | | | | | | | |
| Date Last Pay: | | | | | | | |
| Open Date: | Closed Date: | 05/07/2007 | 08/29/2007 | | 05/07/2007 | | |
| Spec Comm Code: | | | | | | | |
| Cons Compl Code: | | | | | | | |
| Type: | Terms: | Freq: | 4D | | 4D | 001 | |
| Original Creditor: | | | | | | | |

*See* Ex. 41, Experian ACDV.



| | ACCT STATUS | PAYMENT RATING | SPECIAL COMMENT CD | COMPLIANCE CONDITION CD |
|---|---|---|---|---|
| SENT | 97 | | | |
| RECEIVED | 97 | | | |

*See* Ex. 42, Trans Union ACDV.



| | | |
|---|---|---|
| Consumer Info Indicator | | |
| Compliance Condition Code | | |
| Special Comment Code | | |
| Account Status | [97] Unpaid balance reported as a loss by credit grantor (charge-off) | |
| | [97] Unpaid balance reported as a loss by credit grantor (charge-off) | |
| Payment Rating | [L] Charge-Off | |

*See* Ex. 43, Equifax ACDV.

> **(4)    AT&T's False And Inaccurate Reporting Of $10 Balance In Responding To Plaintiff's Dispute To Equifax.**

45.    On or about August 16, 2009, without any justification whatsoever, AT&T yet again falsely and illegally levied charged against Plaintiff for various long distance fees and taxes in the amount of $10.32.  *See* Ex. 48, AT&T Printout Statement Ending August 16, 2009.

31

46.     Thereafter, in connection with responding to Plaintiff's dispute to Equifax, AT&T updated the account balance to falsely and inaccurately reflect that Plaintiff owed a $10 balance to AT&T:

| 4D | I | | O- |
|---|---|---|---|
| Credit Limit | High Credit | Current Balance | Past Due |
| | | $0 | $0 |
| | | $10 | $0 |
| Original Charge-Off | Date 1st Delinquency | Last Payment Date | Date Closed |

*See* Ex. 43, Equifax ACDV.

### G. AT&T As A Matter Of Practice Never Conducts A Meaningful Investigation In Connection With A Dispute Received From A Credit Reporting Agency And Never Acknowledges Any Consumer Dispute Before Marking Any Account As "Disputed."

47.     AT&T's credit reporting disputes are outsourced to NCO Financial Systems, Inc. ("NCO") through a contractual arrangement with NCO, and are handled at a facility in North Charleston, South Carolina.   *See* Ex. 49, March 18, 2011 Deposition of NCO Corporate Representative Lordes Jaeger ("Jaeger Dep."), at 16:4-17:10;[6] Ex. 50, March 18, 2011 Deposition of NCO Employee Maria Page ("Page Dep."), at 12:21-13:5, 14:17-25.[7]

48.     AT&T does not assign a single employee of its own to supervise onsite the credit reporting dispute process that occurs the North Charleston facility:

*Q.   To your knowledge everybody who works here is an NCO employee?*

*A.   Yes.*

*Q.   So you're not aware of any AT&T employee who is stationed at this location?*

*A.   No, I don't.*

*See* Ex. 50, Page Dep., at 15:5-10.

---

[6]     Lordes Jaeger is also the supervisor for credit reporting disputes.

[7]     Maria Page is the NCO employee who responded to Plaintiff's Trans Union credit report dispute.

49.     Workers who handle responding to credit reporting disputes are expected to handle between 50 and 100 disputes per day making the average amount of time spend on a dispute between five and ten minutes, and the speed at which workers complete disputes is considered in whether or not the worker receives a bonus:

> Q.    Okay.  With respect to disputes through the e-OSCAR system, how many would you say that you typically do on any given day?
>
> A.    Roughly around -- between 50 to 100.
>
> *   *   *
>
> Q.    What would you perceive as a low number?
>
> A.    As a low?  I guess under 50.
>
> Q.    Under 50.  So it's your understanding that you ought to be handling at least 50 disputes per day?
>
> A.    Yes.  If that's what we do.
>
> *   *   *
>
> Q.    Miss Page, what would you estimate is the average amount of time it takes you to respond to a credit reporting dispute?
>
> A.    Approximately, depending on the account, between five, ten minutes.
>
> *   *   *
>
> Q.    Do you have any perceived expectations of what your supervisors expect you -- of you in terms of how long it would take you to complete a dispute?
>
> A.    Yes.
>
> Q.    What's your expectation?
> A.    Between five to ten minutes.
>
> Q.    Taking more than ten minutes in your perception would be too long?
>
> A.    Yes.

Ex. 50, Page Dep., at 20:16-19; 21:1-10; 51:23-52:22.  *See also* Ex. 40, Jaeger Dep., at 38:1-16; 39:6-40:2.

50.     Workers who handle disputes also receive minimal in infrequent training, received no training materials and have no knowledge of the FCRA.  *See* Ex. 50, Page Dep., at 24:5-27:7; Ex. 49, Jaeger Dep., at 64:22-65:4; 65:16-18.

51.     The individual at the North Charleston facility who supervises the workers who respond to credit reporting disputes, Lordes Jaeger, has never even completed a response to a credit reporting dispute herself.  *See* Ex. 49, Jaeger Dep., at 21:1-7.

52.     Workers who handle disputes respond to the dispute by following a 1½ page script prepared by AT&T which virtually assures that uniformly no meaningful dispute will be conducted regardless of how or what the consumer disputes.  *See* Ex. 51, Credit Reporting Dispute Response Script.

*Q.  When you respond to credit reporting disputes, do you have an understanding of a routine practice that you use in order to respond to that dispute?*

*A.  Yes.*

*Q.  Okay.*

*Q   [Placing Exhibit 51 in front of witness] Miss Page, I'd like you to review this document and tell me whether or not this document adequately sets forth your understanding of the routine practice that you or any other person here would use in connection with responding to a credit reporting dispute.*

*A.  Okay.  Yes, I recall that.  I'm familiar with this.*

*Q.  You recognize the document?*

*A.  Yes.*

*Q.  You've seen it before?*

*A.  Yes.*

*Q.   Okay.  And the question was does this document adequately set forth your understanding of the routine practice that you or anyone else here would use in connection with responding to a credit reporting dispute?*

34

> *A.  Yes, sir.*
>
> *Q.  Okay.  Are you allowed to deviate from this routine?*
>
> *A.  No.*
>
> *Q.  The best of your knowledge your responsibility here is to follow this routine precisely?*
>
> *A.  Yes, sir.*

Ex. 50, Page Dep., at 32:1-33:15.

> *Q.  Okay.  This is a document that was provided by AT&T to the company?*
>
> *A.  Yes.*
>
> *Q.  Okay.  So this is -- this document was -- to your knowledge was prepared by AT&T?*
>
> *A.  Yes.*
>
> *  *  *
>
> *Q.  And to clarify, the procedure that we are discussing here, the individuals who prepare responses are required to follow that procedure, correct?*
>
> *A.  Yes.*
>
> *Q.  Are they allowed to deviate from that procedure?*
>
> *A.  No.*

Ex. 49, Jaeger Dep., at 35:21-36:1; 37:13-20.

      53.    With respect to the "response code," "Modify" (as opposed to "Delete") is <u>always</u> selected for the "response code" in rare instance where the account being disputed cannot be located on AT&T computer account database (RCAM), was sold, or is fraudulent:

> - Response Code-select Modify (select delete if you will be deleting).
> - Access the account in RCAM (RCAM number is above the name)
> - If the account is not in RCAM you will delete

*See* Ex. 51.

35

*(Ms. Page discussing the "Response Code")*

*Q.    Is there any other circumstance where you will select delete other than when you can't locate the account on the RCAM system, the account has been sold or the account is being treated as a fraud account?*

*A.    That's -- those are the occasions when we delete.*

Ex. 50, Page Dep., at 36:13-19.

54.    With respect to the "account status code," code 97 for "charge-off" is <u>always</u>

selected regardless of the nature of the dispute:

- Account Status-should be 97 :Unpaid balance reported as a lost credit grantor (charge-off)

*See* Ex. 51.

*Q.    I'll read it out loud.  It states: Account status, should be 97, unpaid balance reported as a lost credit grantor, and then in parentheses, charge-off.*

*A.    Um-hum.*

*Q.    As part of your routine practice, Miss Page –*

*A.    Yes.*

*Q.    -- is there any circumstance where you will not enter a 97 in the account status field?*

*A.    No.*

*Q.    So it is your routine practice to enter a 97 in the account status field in connection with a dispute?*

*A.    Yes.*

*Q.    And you never deviate from that practice?*

*A.    We don't.*

Ex. 50, Page Dep., at 37:9-38:1.

55.     Furthermore, the "compliance condition code" (which would be used to indicated that an account is in "dispute" or "disputed") is <u>always</u> left blank regardless of the nature of the dispute:

• **Compliance Condition Code-blank**   -

*See* Ex. 51.

*(Ms. Page discussing the compliance condition code)*

*Q.  I'll read out loud.  It says: Compliance condition code, dash, blank.  Would it be fair to assume that the word blank means don't enter anything?*

*A.  Correct.*

*Q.   As part of your routine practice do you always leave the compliance condition code blank?*

*A.  Yes.*

*Q.  Do you ever deviate from that practice?*

*A.  No.*

*Q.   So in connection with any dispute you receive from a credit reporting agency you will leave the compliance condition code blank?*

*A.  That's correct.*

Ex. 50, Page Dep., at 38:7-20.

56.     In responding to a dispute, workers will <u>never</u> check billing records and Plaintiff's billing records were <u>never</u> checked:

*Q.   In connection with preparing a response to a credit reporting dispute, do you use any information other than what is in the RCAM system?*

*A.  No.*

*Q.  Will you ever refer to the customer's billing records in connection with responding to a dispute?*

*A.  No.*

\*   \*   \*

*Q.    The question I asked was you don't have any reason to believe that you ever looked at Dennis Van Veen's billing records in connection with responding to the credit reporting dispute he waged with TransUnion?*

*A.    Probably not.*

Ex. 50, Page Dep., at 46:18-47:25.

57.    In responding to a dispute, workers will <u>never</u> check call records and Plaintiff's

call records were <u>never</u> checked:

*Q.    Do you ever look at call-in notes in connection with responding to a credit reporting dispute?*

*A.    If I what?  I'm sorry.*

*Q.    The notes that are kept when a customer calls the center, do you ever refer to the call notes in connection with responding to a dispute?*

*A.    No.*

*Q.    That would not be your routine practice?*

*A.    It wouldn't be, no.*

*Q.    And you don't have any reason to believe that you looked at any call notes in connection with responding to the credit reporting dispute waged by Mr. Van Veen through TransUnion?*

*A.    No, sir.*

Ex. 50, Page Dep., at 48:1-16.

58.    In responding to a dispute, workers will <u>never</u> review a consumer dispute history

and Plaintiff's dispute history was <u>never</u> checked:

*Q.    Miss Page, do you ever review any dispute history relating to a customer in connection with responding to a credit reporting dispute?*

*A.    No.*

*Q.    That would not be your routine practice?*

38

*A.   It would not be routine.*

*Q.   And you don't have any reason to believe that you ever looked at any prior disputes waged by Mr. Van Veen in connection with preparing a response to the TransUnion credit reporting dispute that he waged?*

*A.   Probably not.*

Ex. 50, Page Dep., at 49:16-50:4.

59.     In responding to a dispute, workers will <u>never</u> call or contact a consumer and

Plaintiff was <u>never</u> contacted:

*Q.   Do you ever call a consumer in connection with responding to a credit reporting dispute?*

*A.   No, sir.*

*Q.   That would not be your routine practice?*

*A.   No.*

*Q.   You don't have any reason to believe that you called Mr. Van Veen in connection with responding to the credit reporting dispute that he waged against TransUnion?*

*A.   No.*

Ex. 50, Page Dep., at 50:5-16.

60.     In responding to a dispute, workers will <u>never</u> call or contact other entities who

were perhaps involved in the dispute and other entities were <u>never</u> contacted in connection with

Plaintiff's dispute:

*Q.   Do you ever confer with other entities that may have involvement with the dispute, for example, another telecommunications company, in connection with responding to a credit reporting dispute?*

*A.   No, sir.*

*Q.   That would not be your routine practice?*

*A.   No.*

39

*Q.    You don't have any recollection of contacting the telecommunications company IDT in connection with responding to Mr. Van Veen's credit reporting dispute to TransUnion?*

*A.   No, sir.*

Ex. 50, Page Dep., at 50:17-51:7.

### H.  Plaintiff  Claims Actual Damages And Punitive Damages As A Result Of AT&T's Violations Of The FCRA.

61.    But for the derogatory and inaccurate AT&T account, Plaintiff has otherwise perfect credit.  *See, e.g.,* Ex. Ex. 22.

62.    As a result of these AT&T's failures in responding to Plaintiff's credit reporting disputes, Plaintiff has suffered harm in the form of lost credit opportunities, harm to credit reputation, and emotional distress.  *See* Pl. Counter-Statement of Facts, at ¶ 24; Ex. 1, Van Veen Dep., at 68:22-69:24; 72:18-75:7; 110:11-111:4; 111:22-112:8; 145:15-148:11.

63.    By way of example, Plaintiff described the effect of AT&T conduct on him during his deposition as follows:

> *It was like a personal assault.  It's like being the kid in the school yard and all of a sudden the bully comes up to you and says, hey, you stepped over the line, you know, you owe me $200.  Then when you don't pay, then the – the incessant collection calls start and then they attack your credit.  It was -- it was very upsetting in some ways.*

*See* Ex. 1, Van Veen Dep., at 75:17-76:1.

64.    Plaintiff further identified AT&T's failures in connection with responding to his credit reporting dispute as the source of his injuries:

> *Q.   You had previously testified that you suffered from stress and anxiety regarding AT&T's conduct in connection with what happened in relation to this lawsuit?*
>
> *A.   Yes.*

40

*Q.     Was part of the stress and anxiety that you experienced a result from the fact that AT&T continued to report an AT&T account in a derogatory fashion on your credit report after you had disputed to the three credit reporting agencies; Equifax, Trans Union and Experian?*

*A.  Correct.*

*Q.  As part of your stress and anxiety,  did you suffer from a loss of concentration at work?*

*A.  Yes, very much so.*

*Q.     As part of the harm caused to you in connection with this lawsuit, do you feel that your reputation has been harmed as a result of what AT&T reported to credit reporting agencies?*

*A.  I think my reputation definitely was impugned for a time.*

*Q.   Do you feel that it was also impugned, as you put it, after AT&T continued to report your credit in a derogatory fashion after you disputed to the three credit reporting agencies; Equifax, Experian and Trans Union?*

*A.  Yes.*

*Q.  Was it a source of embarrassment for you when you were told by creditors that you had derogatory information on your credit report which is the AT&T account?*

*A.  To answer your question, yes, very much so.*

*See id.* at 145:15-147:16 (objections omitted).

65.     Plaintiff further has spend substantial time and effort disputing to AT&T for which he seeks damages as well.  *See id.* at 73:3-21.

66.     Furthermore, as a result of  willful nature of AT&T's unreasonable egregious practices.  Plaintiff seeks punitive damages as well.  *See* Pl. Counter-Statement of Facts, at ¶ 33-60.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a motion for summary judgment will only be granted if:

> The movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(a).  The Third Circuit has likewise said that summary judgment may only be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party.  *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998); *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988), *cert. denied*, 488 U.S. 870 (1988).

A court may not, at the summary judgment stage, weigh evidence or make credibility decisions.  These tasks are left to the jury as fact-finder.  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993), *cert. denied*, 510 U.S. 994 (1993).  To raise a genuine issue of material fact, the respondent need not match, item-for-item each piece of evidence proffered by the movant.  As the Third Circuit has explained:

> In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quality of the movant's evidence far outweighs that of its opponent.  It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

*In re Unisys Savings Plan Litig.*, 74 F.3d 420, 433 n.10 (3d Cir. 1996).  Gaps in the pertinent materials submitted by the movant without explanation also justify denial of the motion.  *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir. 1989).

## ARGUMENT

**I.    AT&T REPORTED NUMEROUS INACCURACIES IN RESPONDING TO PLAINTIFF'S CREDIT REPORTING DISPUTES.**

Plaintiff's FCRA claim here is that AT&T responded to his properly lodged credit reporting disputes by supplying <u>incomplete and inaccurate</u> information about him to the national credit reporting agencies.  Thus, AT&T violated FCRA section 1681s-2(b), which requires a credit furnisher such as AT&T to correct any incomplete or inaccurate information that it has furnished to any credit reporting agency.  *See* 15 U.S.C. § 1681s-2(b).  Defendant first argues that it is entitled to summary judgment purportedly because it reported "accurate" information as to Mr. Van Veen.  This argument is entirely without merit.

The Third Circuit has said that "accuracy" under the FCRA requires more that "merely allowing for the possibility of accuracy."  *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010).  Accurate information must be not only true, but precise and not misleading.  *Id*.  One court in this District construed the meaning of "accuracy" as follows:

> the FCRA uses the word "accuracy" more "objectively" than [defendant] would prefer. An objective understanding of accuracy requires congruence between the legal status of a consumer's account and the status a [defendant] reports.  Put another way, a consumer report cannot be "accura[te]" under either section 1681e(b) or section 1681i if it contains information that is legally incorrect.

*Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311, 318 (E.D. Pa. 2003) (*citing Cushman v. Trans Union Corp.*, 115 F.3d 220 (3d Cir. 1997)) (footnote omitted) (Dalzell, J.).

Furthermore, even if a credit item is technically accurate, a defendant still violates the FCRA if the way in which it reports that item is "misleading or materially incomplete."  *Evantash v. G.E. Capital Mortg. Servs., Inc.*, 2003 WL 22844198, at *4 (E.D. Pa. Nov. 25, 2003); *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 42 (D.C. Cir. 1984).  A credit item may be considered inaccurate or incomplete for purposes of the FCRA if the way it is reported is

43

misleading to potential creditors.  *Agosta v. Inovision, Inc.*, 2003 WL 22999213, at *5 (E.D. Pa. Dec. 16, 2003); *Curtis v. Trans Union*, 2002 WL 31748838, at *4 (N.D. Ill. Dec. 9, 2002) (finding that even factually correct information may be "inaccurate" for FCRA purposes where such information may be misleading to party reviewing consumer's credit report).  *See also DiPrinzio v. MBNA America Bank, N.A.*, 2005 WL 2039175, at *3-4 (E.D. Pa. Aug. 24, 2005) (materially incomplete reporting of true credit account is not accurate for FCRA purposes where creditor omitted that consumer had disputed joint account and had separated from her husband who had actually incurred debt after separation).

Here, AT&T cannot possibly make an accuracy defense as a matter of law.  Plaintiff has proffered evidence that he had no contract with AT&T, was never AT&T's customer and never owed AT&T any money for any telephone service. *See* Pl. Counter-Statement of Facts, at ¶¶ 1-3, 11-17.  In connection with the disputed account, the FCC found that Plaintiff was "absolved" of the purported debt. *See id.* at ¶¶ 27-28, 31.  AT&T's own billing statements reflect that that debt was a result of "incorrect AT&T billing." *See id.* at ¶ 31.  AT&T also by its own admission reported a false balance in response to Plaintiff's dispute to Equifax.  Considering these facts, AT&T cannot seriously argue that it reported "accurate" information when it kept the disputed account on Plaintiff's credit reports.  Minimally, a genuine issue of material fact exists as to the disputed "accuracy" of the AT&T account.  Also, as will be discussed *infra*, AT&T surely did not report "complete" information about the account as "disputed" by Plaintiff. *See id.* at ¶¶ 43-48.  Thus, AT&T cannot obtain summary judgment under FCRA section 1681s-2(b), which requires both complete and accurate information.

**II.   AT&T IS RESPONSIBLE TO REPORT AN ACCOUNT AS "DISPUTED" BY A CONSUMER IN CONNECTION WITH RESPONDING TO A CREDIT REPORTING DISPUTE AND DID NOT DO SO IN THIS CASE.**

    **A.   The Fourth Circuit And Ninth Circuit Have Held That A Furnisher Is Responsible To Report An Account As "Disputed" By A Consumer In Connection With Responding To A Credit Reporting Dispute.**

AT&T would like this Court to ignore that it never reported "complete" information about the purported debt insofar as it never noted the "disputed" nature of the account. Substantial precedent exists, however, that confirms a furnisher of credit information is obliged to report an account as "disputed" in connection with responding to a credit reporting dispute waged by a consumer pursuant to Section 1681s-2(b) of the FCRA.  The Fourth Circuit in *Saunders v. Branch Banking and Trust Co. of VA* concluded:

> [The] FCRA requires furnishers to determine whether the information that they previously reported to a [credit reporting agency] is " incomplete or inaccurate." § 1681s-2(b)(1)(D). In so mandating, Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading. Courts have held that a credit report is not accurate under FCRA if it provides information in such a manner as to create a materially misleading impression. . . .
>
> In sum, . . . the jury could reasonably conclude that [the defendant furnisher's] decision to report the debt without any mention of a dispute was "misleading in such a way and to such an extent that it can be expected to have an adverse effect."

526 F.3d 142, 148,150 (4th Cir. 2008).

The Ninth Circuit in *Gorman v. Wolpoff & Abramson, LLP* also reached the same conclusion adopting the *Saunders* opinion:

> The Fourth Circuit has recently held that after receiving notice of dispute, a furnisher's decision to continue reporting a disputed debt without any notation of the dispute presents a cognizable claim under § 1681s-2(b). . . .
>
> [the Fourth Circuit's] reasoning is persuasive. . . . holding otherwise would create a rule that, as a matter of law, an omission of the disputed nature of a debt never renders a report incomplete or inaccurate. Not only might such a rule intimidate

> consumers into giving up bona fide disputes by paying debts not actually due to
> avoid damage to their credit ratings, but it also contravenes the purpose of the
> FCRA, to protect against "unfair credit reporting methods."

584 F.3d 1147, 1162-63 (9th Cir. 2009).  Multiple district courts have reached the same result.

*See also Shames-Yeakel v. Citizens Financial Bank*, 677 F. Supp. 2d 994, 1005 (N.D. Ill. 2009)

("the record contains sufficient evidence to support a finding that Citizens violated the FCRA by

reporting a debt arising from a theft but failing to note the disputed nature of that debt.");

*Diprinzio*, 2005 WL 2039175, at *3-4 ("Plaintiff's complaint alleges that defendant neglected to

report the disputed status of her account to the consumer reporting agencies. . . .The Court deems

such allegations sufficient to survive summary judgment.").

AT&T's only rebuttal to the well reasoned opinions of the Fourth Circuit and Ninth

Circuit is that both opinions were somehow "wrongly decided."  In making this argument,

AT&T does not cite a single case that supports such a conclusion.[8]  Moreover, AT&T's

reasoning in claiming that these opinion were somehow "wrongly decided" is the exact same

argument that was refuted and disposed of by both *Saunders*  and *Gorman*:

> [The Defendant furnisher] contends that reporting a debt without reporting its
> disputed nature can *never* be deemed inaccurate as a matter of law. . . [the
> furnisher] relies on asserted critical differences between § 1681s-2(a) and §
> 1681s-2(b). The former imposes a duty on furnishers to provide accurate
> information, *see* § 1681s-2(a); *inter alia,* it requires furnishers to report consumer
> disputes, *see* § 1681s-2(a)(3). [the furnisher] contends that the absence of a
> specific requirement to report consumer disputes in § 1681s-2(b) means that
> Congress did not intend for furnishers to report disputes to CRAs when
> responding to their requests for consumer dispute verification.

---

[8]    The two cases cited by AT&T are inapposite with respect to AT&T's contention that the
*Saunders* and *Gorman* were "wrongly decided."  *In Scheel-Baggs v. Bank of America*, 575 F. Supp. 2d
1031 (W.D. Wis. 2008), the district court does not in any respect indicate that *Saunders* or *Gorman* were
wrongly decided.  *Id.* at 1039. The Court was simply attempting to clarify the analysis required to
determining the manner in which  a furnisher violates section 1681s-2(b) by failing to report an account
as disputed. *Id.*  Similarly, in *In re Benson*, 445 B.R. 445 (Bankr. E.D. Pa. 2010), a bankruptcy court
opinion, the court does not even consider *Saunders, Gorman* or section 1681s-2(b) of the FCRA for that
matter. *Id.* at 449. The Court is solely analyzing a debt collector's obligations under the FDCPA. *Id.*

> This argument ignores the interplay of § 1681s-2(a) and § 1681s-2(b). The first subsection, § 1681s-2(a), provides that furnishers have a general duty to provide accurate and complete information; the next subsection, § 1681s-2(b), imposes an obligation to review the previously disclosed information and report whether it was "incomplete or inaccurate" upon receipt of a notice of dispute from a CRA. The second subsection thus requires furnishers to review their prior report for accuracy and completeness; it does not set forth specific requirements as to what information must be reported, because these requirements have already been set forth in the first subsection. No court has ever suggested that a furnisher can excuse its failure to identify an inaccuracy when reporting pursuant to § 1681s-2(b) by arguing that it should have *already* reported the information accurately under § 1681s-2(a).

*Saunders*, 526 F.3d at 149-150. *See also Gorman,* 584 F.3d at 1162-63; *Shames-Yeakel*, 677 F. Supp. 2d at 1005.

Although the Third Circuit has not yet ruled on a case on this kind, AT&T's proposition to this Court is plainly untenable. Without offering any legal support for its arguments from any court in the country, AT&T is asking this Court to conclude that two federal circuit courts have somehow "wrongly decided" an issue when both of those courts in well reasoned opinions have rejected the exact same argument offered by AT&T. AT&T's motion in this regard is lacking legal merit entirely and should be denied.

## B.  Plaintiff Waged Meritorious Disputes To The Credit Reporting Agencies.

AT&T alternatively makes the unfounded argument that Plaintiff's credit reporting disputes were somehow meritless. Nothing could be further from the truth. As was discussed in the previous section regarding the inaccuracies of AT&T's response to Plaintiff's disputes, AT&T had no justification to even report an account about Plaintiff to the credit reporting agencies let alone report the account as an unpaid charge-off and with an erroneous balance. *See* Pl. Argument, at Sec. I, *supra.*;  Pl. Counter-Statement of Facts, at ¶¶ 1-3, 11-17,  27-28, 31, 36-46.

AT&T's claim that Plaintiff possesses "no valid excuse" for not paying the charges levied against him is pure fantasy. AT&T appears to have forgotten that it possesses no contractual relationship with Plaintiff in any respect and that Plaintiff was never a non-subscribed telephone user making calls over AT&T's network. *See id.* at ¶¶ 1-3, 30. IDT itself has even confirmed as much. *See id.* AT&T also appears to have forgotten that it orchestrated a network shutdown by its own hand that resulted in the wrongful and illegal billing of hundreds if not thousands of IDT customers including Plaintiff. *See id.* at ¶¶ 6-10. AT&T also seems to have forgotten that four separate FCC Orders have found that AT&T's billing of IDT customers in connection with the network shutdown were indeed acts of slamming thus "absolving" Plaintiff and other consumers from responsibility for the unauthorized charges. *See id.* at ¶¶ 11-17.

AT&T likewise does not even care to remember its own course of conduct wherein it advised the FCC in writing approximately a month prior to Plaintiff's first dispute that Plaintiff possessed a zero balance. *See id.* at ¶ 28. AT&T also similarly forgets that approximately a month prior to the date Plaintiff wages his first dispute, Plaintiff received a statement from AT&T indicating that possessed a zero balance due to "incorrect AT&T billing." *See id.* at ¶ 31. AT&T also must have forgotten that it admitted in its own brief that it falsely reported and verified that Plaintiff owed a $10 balance on the account without any justification whatsoever. *See id.* at ¶¶ 45-46; Def. Statement of Facts, at ¶¶ 55, 87-88.

The circumstances in *Shames-Yeakel v. Citizens Financial Bank* are also instructive on this subject. *See* 677 F. Supp. 2d at 1005. *Shames-Yeakel* involved claims against a furnisher of credit who was reporting a delinquent balance for funds stolen from the plaintiff's home equity line of credit as result of identity theft. *Id.* at 997-99. The Plaintiff claimed that various federal

electronic fund transfer and lending laws absolved the plaintiff's from responsibility for the stolen funds.  *Id.* Accordingly, the plaintiff disputed the furnishers delinquent reporting of the account.  The furnisher, however, verified the delinquent reporting of the account.  *Id.*  In denying the furnisher's motion for summary judgment, the Court found:

> Plaintiffs have a colorable argument that the [Truth In Lending Act] limited their liability for the stolen funds. If this is so, then a report from the bank that Plaintiffs owed the money could certainly qualify as "inaccurate," such that Citizens had a duty to modify, delete, or block the information from its credit reports. § 1681s–2(b)(1)(E). Furthermore, **even if Plaintiffs' [Truth In Lending Act] claim ultimately fails, [the bank] knew that Plaintiffs contested the debt and therefore may have had a duty to report the disputed nature of the debt**. Plaintiffs' credit history suggests that [the bank's] reports did not note any such information.  If it did not, a reasonable finder of fact could conclude that failure to report such important details was "misleading in such a way and to such an extent that it [could have been] expected to have an adverse effect" on Plaintiffs.

*Id.* at 1005 (emphasis added).  Plaintiff's grievance with AT&T regarding its alleged illegal billing of Plaintiff in violation of federal anti-slamming laws presents precisely the same circumstance.

As the plethora of material facts above and relevant case law confirm, AT&T's argument that Plaintiff's disputes were meritless is a farce.  Nonetheless, a disputed issue of material fact undeniably exists on the subject of whether AT&T should have noted Plaintiff's dispute in response to his credit reporting disputes.  AT&T Motion as such on this subject should be denied.

## III.   AT&T'S PURPORTED INVESTIGATIONS OF PLAINTIFF'S CREDIT REPORTING DISPUTES WERE INHERENTLY UNREASONABLE.

AT&T desires a finding, as a matter of law, that its so called investigation was reasonable.  Such a determination, however, is most always a jury question.  *See Cortez,* 617 F.3d at 709 ("reasonableness . . . 'is normally a question for trial'") (*quoting Sarver v. Experian Info. Solutions,* 390 F.3d 969, 971 (7th Cir. 2004)).  AT&T is obliged to conduct a reasonable

investigation before responding to a consumer dispute received from a credit reporting agency. *See* 15 U.S.C. §1681s-2(b); *Gorman v. Wolpoff & Abramson, LLP* 552 F.3d 1008, 1017 (9th Cir. 2009); *Johnson v. MBNA America Bank, N.A.*, 357 F.3d 426, 430-31 (4th Cir. 2004); *Agosta v. Inovision, Inc.*, 2003 WL 22999213, at *5 (E.D. Pa. Dec. 16, 2003); *Evantash v. G.E. Capital Mortg. Servs., Inc.*, 2003 WL 22844198, at *6 (E.D. Pa. Nov. 25, 2003). A failure to do so renders AT&T liable for the inaccuracies it has reported and verified in responding to the dispute. *See id.* Whether a reasonable investigation was conducted is ordinarily a jury question. *See Johnson,* 357 F.3d at 431.

In considering the parameters of a reasonable investigation, the Fourth Circuit in *Johnson* observed that:

> the plain meaning of "investigation" clearly requires **some degree of careful inquiry by creditors**. Further, § 1681s-2(b)(1)(A) uses the term "investigation" in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute-and, ultimately, correct-inaccurate information on their credit reports, Congress used the term "investigation" to include superficial, *un*reasonable inquiries by creditors.

357 F.3d at 430-31 (emphasis added). AT&T's procedure to respond to a credit reporting dispute, however, reveals that no meaningful investigation a consumer's dispute is ever conducted regardless of the substance of the consumer's stated dispute. *See* Pl. Counter-Statement of Facts, at ¶¶ 47-60.

As stated in more detail in Plaintiff's Counter-Statement of Facts, the script created by AT&T which workers use to respond to a dispute will always produce the same outcome no matter what the consumer disputes. *See id.* The script categorically produces that following results:

- the account at issue is <u>never</u> deleted unless the account cannot be located on the RCAM database;

50

- the account at issue is <u>always</u> verified as "charged off" regardless of the substance of the dispute.

- the account at issue is <u>never</u> marked "dispute" regardless of the substance of the dispute.

*See id.* at ¶¶ 52-55.   AT&T's script is used by workers as part of their routine practice in responding to every dispute received.  *See id.*  The script was used in connection with responding to Plaintiff's disputes in 2009.  *See id*.  The script disturbingly <u>continues to be used</u> by AT&T to date.  *See id.* at ¶¶ 52-55.[9]

Workers are afforded absolutely no flexibility in deviating from the script. Workers are <u>never</u> permitted and <u>do not</u> conduct any of the following investigative activities:

- check billing records;

- check call records;

- review a consumer dispute history;

- call or contact a consumer;

- call or contact other persons or entities who were involved with the dispute.

*See id.* at ¶¶ 56-60.   Any of these activities could have substantially changed the outcome of Plaintiff's disputes, but AT&T's dispute procedures did not even make such activities an option. Investigations notably have been found to be unreasonable when a furnisher only conducts a brief review of its computer records or does not look beyond the information contained in its customer service computer system or does not consult any underlying documents such as billing records and prior disputes records.  *See Johnson*, 357 F.3d at 431 (affirming denial of summary

---

[9]     AT&T's focus on cases finding that a furnisher conducted a reasonable investigation in light of the vague nature of the dispute is inapplicable here. As explained above, AT&T's script for responding to credit reporting disputes forces the worker to provide the same response regardless of substance of the dispute.  Accordingly, AT&T's gripes about the purported vagueness of the information provided by the credit reporting agencies in connection with Plaintiff's dispute is simply irrelevant to the analysis here.

judgment on said grounds).

Furthermore, AT&T's oversight of its credit reporting dispute response program is simply abysmal. AT&T does not even bother to respond to disputes using its own employees. Instead, it contracts with another company, NCO Financial Systems, Inc., a debt collection outfit, to respond to the dispute on its behalf. *See* Pl. Counter-Statement of Facts, at ¶ 47. AT&T does not assign a single employee of its own to supervise onsite the credit reporting dispute process that occurs at NCO's North Charleston facility. *See id.* at ¶ 48. Even more disturbing, the individual at the North Charleston facility who supervises individuals who respond to credit reporting disputes has never even completed a response to a credit reporting dispute herself. *See id.* at ¶ 48. Workers are then unreasonably expected to handle between 50 and 100 disputes per day at an average speed of five to ten minutes. *See id.* at ¶ 49. Moreover, if the worker fails to complete dispute responses at such a rate, the worker may not receive a bonus. *See id.*

Nothing about the above-stated facts suggest that AT&T conducted a reasonable investigation as a matter of law in connection with Plaintiff's repeated disputes. Indeed, these facts strongly compel the conclusion that AT&T conducts no serious investigation at all in response to a credit reporting disputes ever. Nonetheless, a disputed issue of material fact undeniably exists here leaving it for the jury to determine what investigation would have been reasonable under the circumstances present in this case. AT&T's Motion should be denied in this regard as well.

## IV.    PLAINTIFF MAY RECOVER ACTUAL DAMAGES CAUSED BY AT&T'S VIOLATIONS OF THE FCRA.

AT&T argues that Plaintiff cannot establish a claim allegedly because he cannot show that any action by AT&T "caused" Plaintiff cognizable harm. AT&T is once again mistaken. As a general matter, the Third Circuit has explained that in an FCRA case a plaintiff need not

come forward with a mountain of evidence in order to proceed to the jury with his or her credit

damages claim.  In *Philbin*, the Third Circuit found the following interrogatory response to be

sufficient for the plaintiff to survive summary judgment:

> Plaintiff cannot with specificity outline the actual damages
> sustained. However, he sustained damages over the past (4) four to
> (5) five years as a result of the persistent and continual rejections
> from credit agencies as a result of the false information contained
> in his credit report. Plus the humiliation and embarrassment
> following the rejection with the particular vendor whom [sic] he
> sought credit.

*Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 n.3 (3d Cir. 1996); *see also Crane v. Trans

Union, LLC*, 282 F. Supp. 2d 311, 319 (E.D. Pa. 2003) (summary judgment denied on similar

evidence).

## A.  Plaintiff's Right To Recover Actual Damages For Credit Defamation.

A consumer litigant's right to recover for harm to one's reputation and good name under

the FCRA when a credit reporting agency sells a credit report with false information about that

individual is well settled.  As the U.S. Supreme Court explained in the context of a defamation

suit brought by a business owner against a credit reporting agency:

> Petitioner's credit report concerns no public issue.  It was speech
> solely in the individual interest of the [credit reporting agency] and
> its specific business audience.  This particular interest warrants no
> special protection when-as in this case-the speech is wholly false
> and clearly damaging to the victim's business reputation. . . .There
> is simply no credible argument that this type of credit reporting
> requires special protection . . . .  It is solely motivated by the desire
> for profit, which, we have noted, is a force less likely to be
> deterred than others.  Arguably, the reporting here was also more
> objectively verifiable than speech deserving of greater protection. .
> . . We conclude that permitting recovery of *presumed and punitive
> damages* in defamation cases absent a showing of "actual malice"
> does not violate the First Amendment when the defamatory
> statements do not involve matters of public concern. Accordingly,
> we affirm.

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761-763 (1985) (citations omitted) (emphasis added).

Consistent with the Supreme Court's holding in *Dun & Bradstreet*, courts have regularly affirmed that a consumer may recover for harm to his credit reputation and good name (summarized herein as "credit defamation") as part of her claim for "actual damages" under the FCRA. *See Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409, 418-19 (4th Cir. 2001) ("[Plaintiff] alleges that he suffered . . . loss of reputation as a result of the false report.  Damages for such injuries are recoverable under FCRA."); *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir. 1983) ("Even where no pecuniary or out-of-pocket loss has been shown, the FCRA permits recovery for . . . . injury to one's reputation and creditworthiness."); *Anderson v. United Finance Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982) ("Actual damages may include  . . . injury to credit reputation.") [10]

The numerous circuit courts' holdings cited above further verify the specific intentions of Congress in passing the FCRA:

> [T]he trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine *which can literally ruin his reputation* without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity* to obtain a mortgage to buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible *destruction of his good name* without his knowledge and without reason. . . . The loss of a credit card can, of course, be expensive,

---

[10]     The application of tort principles to the recovery of non-economic damages is likewise inapposite under the circumstances because the FCRA is a pathway independent of the common law for a consumer to recover for non-economic harm.  *See Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834-35 (8th Cir. 1976) ("Defendant cites the much maligned rule that there should be no recovery in tort for mere mental pain and anxiety . . . . however, the rule is inapplicable because, . . . [Plaintiff] has an independent cause of action under the Fair Credit Reporting Act quite apart from any recovery he might have sought in tort.").

> but, as Shakespeare said, the loss of one's good name is beyond
> price and makes one poor indeed.

116 Cong. Rec. 36570 (1970) (Rep. Sullivan speaking) (emphasis added). *See also Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (1982) (in relying on Congressional record above "[w]e have no doubt from this record that plaintiff offered proofs from which the jury could properly have found that defendant's failure in timely fashion to use 'reasonable procedures to assure maximum possible accuracy' occasioned damage to plaintiff's name and consequent anguish and humiliation."). *See also Millstone,* 528 F.2d at 829 (upholding actual and punitive damages in case where consumer reporting agency published false, derogatory information about plaintiff even though insurance company's initial decision to cancel insurance was quickly reversed and no adverse action was taken).

The foregoing cases and congressional record prove beyond a doubt that Plaintiff may recover for credit defamation in connection with her claim for actual damages under the FCRA. Such recovery may be predicated merely upon a showing that false and derogatory information about Plaintiff appeared on a credit report furnished to a third party.

Here, there is no doubt that AT&T reported false and derogatory information about Plaintiff to the credit reporting agencies which subsequently published the information. *See* Pl. Counter-Statement of Facts, at ¶¶ 33-46. A charge-off is notably among the most harmful and derogatory credit items that a consumer can have on his on her report. *See id.* at ¶ 41. *See also id.* at ¶¶ 61-66.

**B.   Plaintiff's Right To Recover Actual Damages For Emotional Distress.**

The FCRA permits a consumer-plaintiff to recover a wide array of emotional and mental distress and anguish, anxiety, humiliation, embarrassment damages. *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225-27 (3d Cir. 1997) (actual damages may be emotional in nature);

*Lawrence v. Trans Union, LLC*, 296 F. Supp. 2d 582, 588-89 (E.D. Pa. 2003); *Evantash v. G.E. Capital Mortgage Servs., Inc.*, 2003 WL 22844198, at *5 (E.D. Pa. Nov. 25, 2003); *Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311, 321 (E.D. Pa. 2003); *Sheffer v. Experian Info. Solutions, Inc.*, 2003 WL 21710573, at *3 (E.D. Pa. July 24, 2003).[11]  "Time spent trying to resolve problems with the credit reporting agency may also be taken into account.")  *Cortez v. Trans Union, LLC*,  617 F.3d 688, 719 (3d Cir. 2010) (*citing Stevenson v. TRW Inc.,* 987 F.2d 288, 297 (5th Cir.1993)).[12]

Due to the importance of one's credit reputation in today's electronic age, juries from around the country have recognized the significance of non-economic damages in FCRA cases and have awarded consumers significant amounts of compensation for emotional distress.  *See Bach v. First Union Natl. Bank*, 2005 WL 2009272, at *7 (6th Cir. Aug. 22, 2005) ($400,000 emotional distress and lost credit opportunity jury verdict upheld); *Cortez v. Trans Union*, E.D. Pa. Civ. No. 05-5684 (Docket No. 44) ($50,000 for emotional distress with no proof of economic harm); *Boris v. Choicepoint Servs., Inc.*, 249 F. Supp. 2d 851, 861 (W.D. Ky. 2003) ($100,000 for humiliation, emotional distress and embarrassment)*; Thomas v. Trans Union*, Civ. No. 00-1150 (D. Or. 2002) (jury award of $5.3 million remitted to $1 million; $300,000 in compensatory damages for emotional distress damages); *Thompson v. San Antonio Retail Merchants Assn.*, 682

---

[11]     *See also Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 & n.3 (3d Cir. 1996); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Stevenson v. TRW Inc.*, 987 F.2d 288, 296 (5th Cir. 1993); *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834-35 (8th Cir. 1976).

[12]     *See Lukens v. Dunphy Nissan, Inc.*, 2004 WL 1661220, at *5 (E.D. Pa. Jul. 26, 2004) (FCRA plaintiff may recover for having to place fraud alert on his credit report and for time in dealing with and attempting to clear up credit inaccuracies).

F.2d 509, 513-14 (5th Cir. 1982) (actual damages recoverable for humiliation and mental distress even when no out-of-pocket expenses existed).[13]

Plaintiff again easily meets and surpasses this standard considering his deposition testimony alone where he articulates substantial emotional impact as result of AT&T's actions. For example, Plaintiff described AT&T's conduct affected him in the following manner:

> It was like a personal assault.  It's like being the kid in the school yard and all of a sudden the bully comes up to you and says, hey, you stepped over the line, you know, you owe me $200.  Then when you don't pay, then the – the incessant collection calls start and then they attack your credit.  It was -- it was very upsetting in some ways.

See Ex. 1, Van Veen Dep., at 75:17-76:1.

AT&T argues that Plaintiff experienced damages that derive in part from harm which occurred before AT&T's failure to reasonably investigate Plaintiff's credit reporting disputes, the first of which occurred in April 2009.  Plaintiff does not disagree.  Nonetheless, AT&T has not set forth any facts or evidence to suggest that Plaintiff did not suffer any actual damages beyond April 2009 as a result of AT&T's conduct.  On the contrary, Plaintiff's deposition is replete with statements explaining the time spent and  emotional distress that he suffered at AT&T's hands as a result of AT&T failures in connection with Plaintiff's credit reporting disputes:

> Q.   You had previously testified that you suffered from stress and anxiety regarding AT&T's conduct in connection with what happened in relation to this lawsuit?
>
> A.   Yes.

---

[13]     See Sloane v. Equifax Info. Servs. LLC, 510 F.3d 495, 505 (4th Cir. 2007) (surveying cases and finding that in more recent FCRA cases challenged on appeal "emotional distress awards suggest that approved awards more typically range between $20,000 and $75,000") (citing Zamora v. Valley Fed. Sav. & Loan Assn. of Grand Junction, 811 F.2d 1368, 1371 (10th Cir. 1987) (upholding jury award of $61,500)); Cortez v. Trans Union, LLC, 2007 WL 2702945, at *2 (E.D. Pa. Sept.13, 2007) (refusing to remit jury award of $50,000); Boris v. Choicepoint Servs., Inc., 249 F. Supp. 2d 851, 860-61 (W.D. Ky. 2003) (remitting jury award of $197,000 to $100,000, including $75,000 award for emotional distress); Anderson v. Conwood Co., 34 F. Supp. 2d 650, 656 (W.D. Tenn. 1999) (remitting jury award of $2,000,000 to $50,000)).

*Q.     Was part of the stress and anxiety that you experienced a result from the fact that AT&T continued to report an AT&T account in a derogatory fashion on your credit report after you had disputed to the three credit reporting agencies; Equifax, Trans Union and Experian?*

*A.  Correct.*

*Q.  As part of your stress and anxiety,  did you suffer from a loss of concentration at work?*

*A.  Yes, very much so.*

*Q.     As part of the harm caused to you in connection with this lawsuit, do you feel that your reputation has been harmed as a result of what AT&T reported to credit reporting agencies?*

*A.  I think my reputation definitely was impugned for a time.*

*Q.  Do you feel that it was also impugned, as you put it, after AT&T continued to report your credit in a derogatory fashion after you disputed to the three credit reporting agencies; Equifax, Experian and Trans Union?*

*A.  Yes.*

*Q.  Was it a source of embarrassment for you when you were told by creditors that you had derogatory information on your credit report which is the AT&T account?*

*A.  To answer your question, yes, very much so.*

*See id.* at 145:15-147:16 (objections omitted).   The simple fact that Plaintiff may have also experienced emotional distress for AT&T's actions which are not at issue here by no means serves as bar to Plaintiff ability to be compensated for those transgressions which are compensable.  Indeed, distinguishing the quantum of Plaintiff's harm is precisely the role of a jury.

AT&T has also ignored the prevailing law of this Circuit regarding damages recoverable in an FCRA case insinuating that Plaintiff is obliged to provide "medical or psychological

58

evidence" to support his claim for emotional distress.  This is a misstatement of the applicable

law.  The Third Circuit has recently stated that:

> . . . we have not adopted, and now refuse to adopt, the Fifth Circuit's standard
> requiring "a degree of specificity which may include corroborating testimony or
> medical or psychological evidence in support of the damage award."  *Cousin*, 246
> F.3d at 371 (quotation omitted).  Such corroboration goes only to the weight of
> evidence of injury, not the existence of it.  If a jury accepts testimony of a plaintiff
> that establishes an injury without corroboration, the plaintiff should be allowed to
> recover under the FCRA.  The fact that the plaintiff's injuries relate to the stress
> and anxiety caused by the defendant's conduct does not change that.  This is
> precisely the kind of injury that Congress must have known would result from
> violations of the FCRA.

*Cortez v. Trans Union, LLC*, 617 F.3d 688, 720 (3d Cir. 2010).  AT&T's argument is thus

directly at odds with the Third Circuit's binding ruling on this subject.[14]

AT&T is similarly mistaken to the extent that it argues Plaintiff must suffer a credit

denial after AT&T responded to Plaintiff's credit reporting dispute in order to recovery actual

damages. "[N]o case has held that a denial of credit is a prerequisite to recovery under the

FCRA." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995).  The

Ninth Circuit in *Guimond*  in considering damages under section 1681e(b) continued:

> [W]e find that a failure to comply with § 1681e(b) is actionable
> even absent a denial of credit. Accordingly, the district court erred
> in finding that any liability under § 1681e(b) was predicated, as a
> matter of law, on the occurrence of some event-denial of credit or
> transmission of the report to third parties-resulting from the
> compilation and retention of erroneous information.

*Id.* (citations omitted) (same actual damages can be recovered under FCRA section 1681e(b) or

section 1681i).  *See also Cairns v. GMAC Mortg. Corp.*, 2007 WL 735564, at *7 (D. Ariz. Mar.

5, 2007) (recognizing that "damages may flow from a consumer being deterred from exercising

---

[14]     AT&T's only support for it unfounded argument is the very case that the Third Circuit
specifically refused to adopt, *Cousins v. TransUnion Corp.*, 246 F.3d 359 (5th Cir. 2001) and *Wantz v.
Experian Info. Solutions*, 386 F.3d 829 (7th Cir. 2004), which cites to *Cousins* in support of its opinion.
*Wantz*, 386 F.3d at 834.

his or her right to apply for credit as a result of inaccurate reporting until the erroneous information is deleted"). *See also Lawrence v. Trans Union LLC*, 296 F. Supp. 2d 582, 588 (E.D. Pa. 2003) (J. Brody) ("The loss of credit opportunities constitutes compensable harm under the FCRA.") (*quoting Philbin v. Trans Union, LLC*, 101 F.3d 957 (3d Cir. 1996)); *Bach v. First Union Nat. Bank*, 149 Fed. Appx. 354, 362 (6th Cir. 2005) (finding that plaintiff's testimony of "lost credit opportunities in the form of a second denied mortgage application and a denied credit card application as well as injury in the form of pain, suffering and humiliation due to [Defendant's] violation," sufficient to uphold jury's actual damages award); *Rothery v. Trans Union, LLC*, 2006 WL 1720498, at *10 (D. Or. Apr. 6, 2006) ("a denial of credit is not mandatory in order to award emotional distress, humiliation and loss of opportunity damages . . . [plaintiff] has presented evidence of emotional distress, humiliation, damage to reputation and loss of opportunities as a result of the reporting of false information, her efforts to dispute the false information, and the aftermath of her failed effort"). Plaintiff here has more than adequately stated an entitlement to actual damages. AT&T's Motion in this regard should also be denied.

## V.     THE WILLFUL NATURE OF AT&T'S CONDUCT IS A JURY QUESTION.

### A.   Plaintiff Is Only Required To Establish That AT&T Acted In Reckless Disregard Of Plaintiff's Consumer Rights To Prove Willful Conduct.

Plaintiff here claims that AT&T's violations of the FCRA were not merely negligent, but willful as well. *See* 2d Am. Compl., at ¶ 23. AT&T argues that Plaintiff should not be allowed to present his willful violation claims to the jury. AT&T is again mistaken. The U.S. Supreme Court in *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007), has held that Congress intended the term "willfully" under the FCRA to have its "common law usage" and concluded that "[t]he standard civil usage thus counsels reading the phrase 'willfully fails to comply' in § 1681n(a) as

reaching reckless FCRA violations." *Id.* at 57.[15] Additionally, the Third Circuit in *Cushman* has previously held that willful FCRA violations can be both  the result of "knowing" or a "reckless disregard" for consumer rights.   *Cushman*, 115 F.3d at 227.   In defining recklessness, The Supreme Court further noted that:

> While the term recklessness is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.

 *Safeco*, 551 U.S. at 68 (citiations omitted).

Although the Court in *Safeco* describes recklessness as an "objective" standard, that finding is entirely consistent with previous U.S. Supreme Court pronouncements in similar contexts which have emphasized that "recklessness" determinations are fact-bound inquiries that must typically be answered by a jury.  *See*, *e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521 (1991) (In defamation cases, "the evidence creates a jury question whether [defendant] published the statements with knowledge or reckless disregard."); *Time, Inc. v. Hill*, 385 U.S. 374, 394 (1967) ("Where either result finds reasonable support in the record it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood."); *Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co*., 312 U.S. 410, 420-21 (1941) (In fraud case, "[t]he question of respondent's recklessness was thus submitted to the jury and we think properly so.").[16]

---

[15]     The U.S. Supreme Court in *Safeco* did not state that a reckless violation is the only one that can be willful under the FCRA: "If, on the other hand, 'willfully' covers both knowing and reckless disregard of the law, knowing violations are sensibly understood as a more serious subcategory of willful ones." *Id.* at 59 (*citing U.S. v. Menasche*, 348 U.S. 528, 538-539, (1955) (" '[G]ive effect, if possible, to every clause and word of a statute' ") (*quoting Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883))).

[16]     The Third Circuit agrees that recklessness determinations are usually reserved for the jury.  *See Frett v. Government of Virgin Islands*, 839 F.2d 968, 978 (3d Cir. 1988) (In Section 1983 case, "we have no difficulty in upholding the district court's conclusion that recklessness was a jury question."); *Healey*

In applying the reckless disregard standard to the facts of FCRA cases, many courts have found that, even though recklessness is an objective *legal* standard, the question of whether a particular set of actions or omissions shows a "reckless disregard" of consumer rights is usually a fact-bound inquiry and thus presents a question for the jury. The Third Circuit in *Cushman*, for example, reversed and remanded a trial court judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(a), and instructed the trial court to consider the plaintiff's FCRA willfulness claim in light of the reckless disregard standard. *See Cushman*, 115 F.3d at 223, 227 (case settled after remand) (*citing Millstore*, 528 F.2d at 834 (upholding FCRA willfulness finding by jury and punitive damages verdict)). Several courts in the Eastern District of Pennsylvania have rejected motions for summary judgment by credit reporting agencies and furnishers alike in FCRA willfulness cases, finding that the reckless disregard determination should be left for the jury. For example, in *DiPrinzio*, the Court denied summary judgment and permitted the plaintiff to proceed to trial with her willful, punitive damages claim because the credit furnisher failed to conduct a reasonable investigation and to clearly disclose that the disputed account had charges that were incurred by the plaintiff's former husband after separation. *DiPrinzio v. MBNA America Bank, N.A.*, 2005 WL 2039175, at *7-9 (E.D. Pa. Aug. 24, 2005). *See also Sheffer*, 2003 WL 21710573 at *3 (punitive damages permitted to go to jury against credit reporting agency and credit furnisher after multiple failed FCRA investigations).[17] Indeed, in *Whitfield v.*

---

v. *Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 650 (3d Cir. 1980) (In securities action, "there was a jury question as to whether these four defendants acted recklessly"); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 146 (3d Cir. 1973) (In product liability case, "whether [defendant's conduct] would constitute a reckless indifference to the public's safety, are, we think, questions which the jury should have been allowed to pass upon.").

[17]    *See also Guimond v. Trans Union Cred. Info. Co.*, 45 F.3d 1329, 1333-36 (9th Cir. 1995); *Abusaab v. Equifax Info. Servs., LLC*, 2006 WL 1214782, at *2 (E.D. Pa. May 4, 2006) (Bartle, C.J.) (denying summary judgment to credit reporting agency for FCRA willfulness claim); *Lawrence*, 296 F. Supp. 2d at 590 (same); *Crane*, 282 F. Supp. 2d at 321 (same); *Evantash*, 2003 WL 22844198, at *8

*Radian Guaranty, Inc.*, 501 F.3d 262 (3d Cir. 2007), the Third Circuit, in a post-*Safeco* FCRA decision, reversed a grant for summary judgment on an FCRA willfulness claim and held that the issue of willfulness was for the jury to decide.  *Id.*  The Third Circuit stated:

> We do not suggest that a factfinder could not or would not determine that [the defendant] did not act willfully.  Instead, *we hold that whether it did so is a factual issue, not a question of law, and it therefore cannot be decided either on appeal or by the District Court as a matter of law.*

*Id*. at 271 (emphasis added) (vacated on mootness grounds, 2008 WL 2329934 (U.S. 2008)).

### B.  Substantial Evidence Exists For A Reasonable Jury To Conclude That AT&T's Conduct Was In Reckless Disregard Of Plaintiff's Consumer Rights.

Plaintiff has set forth a detailed record showing AT&T's reckless conduct in handling credit reporting disputes, and more specifically verifying a patently false and derogatory account on Plaintiff's credit report that was the result of AT&T illegally billing Plaintiff for long distance telephone service.

The circumstances here reveal that AT&T had procedures in place when it responded to Plaintiff's credit reporting disputes wherein no meaningful investigation would ever have occurred because the protocol never permits deletion of accounts, always results in verifying the disputed account as "charged-off" and never results in marking an account as "disputed."  *See* Pl. Counter-Statement of Facts, at ¶¶ 53-55.  This precise fact pattern was affirmed by the Fourth Circuit in *Saunders* as justifying the District Court's denial of a furnisher's request for summary judgment on the issue of the willful nature of failing to report an account as "disputed":

> [The plaintiff] presented evidence that (1) [the furnisher] records reflected the ongoing dispute over the debt, (2) [the furnisher] reports to the CRAs did not reflect that ongoing dispute, and (3) [the furnisher] *intended* not to report that

---

(same); *Rothery v. Trans Union, LLC*, 2006 WL 1720498, at *10 (D. Or. Apr. 6, 2006) (summary judgment denied as to both willful and negligent FCRA claims); *Campbell v. Experian Info. Solutions, Inc.*, 2009 WL 3834125, at *9 (W.D. Mo. Nov. 13, 2009) (denying motion for summary judgment on FCRA willfulness claim).

ongoing dispute. Saunders offered the *admission* of [the furnisher's representative] that [the furnisher] intended to report [the plaintiff's] loan *without mentioning* Saunders' communications or the ongoing dispute reflected throughout [the furnisher's] records. Moreover, evidence at trial revealed that [the furnisher] had *never* updated the report to reflect the dispute.

526 F.3d at 151 (emphasis in original). Indeed, every item laid out by the Court in *Saunders* is present here in this case.

Moreover, virtually all commonplace investigative activities that one might wish to engage in while responding to a credit reporting dispute have been squelched by AT&T's procedures. As such, ordinary investigative activities such as checking Plaintiff's billing records, checking Plaintiff's call records, reviewing Plaintiff's consumer's dispute history; calling Plaintiff or calling or contacting other persons or entities who might possess knowledge related to the dispute for more information were not done. *See* Pl. Counter-Statement of Facts, at ¶¶ 56-60. Furthermore, AT&T had no serious supervision over the process when Plaintiff's disputes were investigated and conducted little training if any with the workers who handled Plaintiff's dispute. Indeed, the supervisor responsible at the time for responding to credit reporting dispute has never even prepared a response herself and does not even know what the FCRA is. *See id.* at ¶¶ 47-48.

AT&T further stifled the prospect of any meaningfully investigation from occurring in connection with Plaintiff's disputes by mandating that dispute must be performed on average within 5 to 10 minutes at the risk of be denied a bonus. *See id.* at ¶ 49. These practices further do not amount to an isolated incident by any means, AT&T has been employing this procedure for years and cavalierly continues to follow this procedure despite this litigation. *See id.* at ¶ 50.

AT&T's conduct with respect to its handling the specific circumstances surrounding Plaintiff's specific disputes is equally egregious. In verifying Plaintiff's credit reporting disputes

three times over, AT&T knowingly and recklessly disregarded the fact that: Plaintiff had <u>no</u> <u>contractual relationship</u> with AT&T whatsoever; it <u>illegally charged Plaintiff for long-distance</u> <u>calls</u> as a result of a network shutdown mishap of its own doing; and consciously <u>ignored four</u> <u>prior FCC orders</u> unambiguously advising AT&T that its conduct in billing IDT as a result of the network shutdown violated federal anti-slamming laws.

Adding to this misconduct, AT&T verified Plaintiff's dispute after having sent correspondence to the FCC one month prior to Plaintiff's first dispute advising the FCC that <u>Plaintiff did not owe any money to AT&T</u>, and which the FCC concluded had "absolved" Plaintiff from any responsibility for the charges. *See id.* at ¶¶ 27-28, 31. Even more disgraceful, AT&T verified Plaintiff's dispute after also send Plaintiff a billing statement informing Plaintiff that the account possessed a $0 balance due to "incorrect AT&T billing" and subsequently falsely verified that Plaintiff owed a balance. *See id.* at  ¶¶ 31, 45-46. Under the facts of this case, a reasonable trier of fact may conclude that AT&T's conduct willfully violated the FCRA.

## C. The "Reasonable Reading" Standard Set Forth In *Safeco* Is Inapplicable To This Matter.

AT&T's reference to *Safeco's* use of the phrase "reasonable reading" is inapplicable here. In *Safeco*, the Court also construed the meaning of the word "increase" under FCRA section 1681m. Safeco had argued that it believed that it was not required to send an "adverse action" notice to first-time customers who were not offered the best insurance rates due to their credit reports. *Safeco*, 551 U.S. at 60-62. Safeco contended that FCRA section 1681m requires such notices for insurance companies only when there is an "increase" in "any charge or insurance," and consumers who do not *already* have insurance with the company cannot suffer an "increase." *Id.* at 60-61. The Court disagreed: "We therefore hold that the 'increase' required

65

for 'adverse action,' . . . speaks to a disadvantageous rate *even with no prior dealing*; the term reaches initial rates for *new applicants*." *Id*. at 63 (emphasis added).

Because the statutory meaning of the term "increase" under FCRA section 1681m was unclear on its face, and also because there was no FTC guidance or appellate court decision on that issue prior to the *Safeco* case, the U.S. Supreme Court concluded that: "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69. The Court thus found that Safeco could not be in willful noncompliance with FCRA section 1681m, relating to adverse action notices for insurance companies, under those circumstances. *Id.*

This portion of the *Safeco* decision is not a defense for AT&T in these circumstances. This is clearly not a case where there is any "threshold inquiry" about the "reading" of any FCRA section or provision. Unlike the meaning of the word "increase" under FCRA section 1681m at issue in *Safeco*, there is nothing "less than pellucid" about the legal standards at issue here. Multiple appeals courts have already construed FCRA section 1681s-2(b) to include reporting accounts as "disputed" by a consumer. Accordingly, AT&T's Motion in this regard should be denied.

## VI.   THE COURT POSSESSES JURISDICTION TO ADJUDICATE PLAINTIFF'S CLAIMS UNDER THE FCRA.

The only pending claim remaining in this lawsuit is Plaintiff's claim against AT&T for violations of section 1681s-2(b) of the FCRA. The FCRA is explicit that "an action to enforce any liability created under this title may be brought in any appropriate United States district court." *See* 15 U.S.C. §1681p. Nowhere in the Plaintiff's Second Amended Complaint does

Plaintiff ask this Court for relief under the Federal Communications Act of 1934 (Sections 201(b), 258 or otherwise).   Accordingly, AT&T's request to transfer this matter is utterly senseless.

AT&T's alternative request that this Court disregard the surrounding circumstance setting the foundation for Plaintiff's credit reporting dispute which includes AT&T's illegal billing of Plaintiff in violation for anti-slamming laws is equally senseless and unjustified. AT&T's violation of anti-slamming laws are inherently relevant to Plaintiff claims setting forth critical facts in relation to both the negligent and willful nature of AT&T's failure to conduct a reasonable investigation of Plaintiff's credit reporting disputes under the FCRA.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court denied AT&T's Motion for Summary Judgment in its entirety.

Respectfully Submitted,

*/s/ Gregory Gorski*
MARK MAILMAN
JOHN SOUMILAS
GREGORY GORSKI
**FRANCIS & MAILMAN, P.C.**
 *Attorneys for Plaintiff*
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA  19110

Dated: July 29, 2011

67